282 N.J. Super. 355 (1994)
660 A.2d 512
MILTON MITZNER, PLAINTIFF-RESPONDENT,
v.
LIGHTS 18 INC., DAVID MITZNER AND JOAN MITZNER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 1993.
Decided January 21, 1994.
*356 Before Judges SHEBELL, LONG and LANDAU.
Robert J. Cirafesi argued the cause for appellants (Wilentz, Goldman & Spitzer, attorneys; Linda Lashbrook, of counsel and on the brief; Peter Tober, on the brief).
Adam D. Mitzner, admitted pro hac vice, argued the cause for respondent (Kovacs & Rader, attorneys; Sanford Rader, of counsel and on the brief).
PER CURIAM.
Since 1972, Lights 18, Inc. has been a corporation engaged in the retail lighting business in East Brunswick, New Jersey. It was formed by two brothers, plaintiff, Milton and defendant, David Mitzner. Each brother was a fifty percent owner of the stock of the corporation and originally both worked in the business although Milton was there full-time while David also held other employment. David developed multiple sclerosis in the late 1970's and has [since then,] been unable to be physically active in the store. Disagreements between the brothers surfaced over time as *357 a result of participation in the operation of the business by David's wife, Joan, who spent several days a week at the store. In October 1991, Milton filed a complaint for involuntary dissolution of the corporation citing, among other things, Joan Mitzner's interference and David and Joan's mismanagement and misappropriation of corporate assets. On October 29, 1991, the trial judge issued an order directing David and Joan to show cause why they should not be permanently enjoined from entering the premises of Lights 18, or operating the business. The order also appointed a provisional director. On December 4, 1991, Joan and David answered and counterclaimed by way of a shareholder's derivative and receivership action against Milton including allegations that Milton appropriated and wasted corporate assets, failed to consult and failed to distribute profits.
During the next several months, the parties entered into negotiations, the aim of which was to effectuate a buy-out by one party of the other's interest. Both parties were represented throughout the negotiations.
On April 20, 1992, the parties appeared in the trial court to announce that they had reached an acceptable settlement, by which Milton would "buy the business for $65,000." Other terms included the payment schedule and a personal guaranty by Milton. The parties agreed that the terms discussed in court represented the entirety of the agreement. Joan and David assented to the settlement on the record. Milton was contacted by phone and his attorney and his son (who is an attorney and was present in court at the time) approved the settlement on his behalf.
On May 15, 1992, David moved before the trial judge for an order authorizing David Mitzner and Milton Mitzner to own and control the respective insurance policies presently existing on their lives, and to have the ownership of the policies and the beneficiaries of the policies changed so as to reflect each party's wishes.
It is undisputed that the life insurance policies in question were purchased when Lights 18 was founded. The corporation bought these "key man" life insurance policies on the lives of both *358 brothers, naming the corporation as beneficiary. The purpose of the insurance was to fund purchase of a deceased brother's 50% share, leaving the survivor with sole ownership of the corporation. The corporation paid the premiums on the policies so long as payment was required. However, when David contracted M.S., coverage continued in effect automatically with no further outlay by the corporation, under the policy terms.
In support of the motion to obtain ownership of the policy, David certified that
In the course of the settlement negotiations, no one brought up the existence of the two insurance policies; we did not remember it until afterwards.
Our attorney told us that it should be simple enough to provide, in the written agreement, that the two former shareholders would just take possession of their respective policies, and she included a paragraph to this effect in the draft she sent to us and to Milton Mitzner's counsel.
But she has since reported to us (from Milton's counsel) that Milton is not willing to release my policy as part of the transfer of the shares. He evidently claims that the policy on my life is an asset of Lights 18, Inc., and that he should be able to keep it even after I no longer have any connection with Lights 18, Inc.
I am just a lay-person, but this seems outrageous to me.
David's lawyer also certified that the policies were not specifically mentioned during negotiations. Milton agreed that the policies were not specifically mentioned during negotiations but countered that the policies are corporate assets of which Joan and David were fully aware and that it was clear at the time of the settlement that all corporate assets were purchased by him when he took David's shares in exchange for $65,000. After hearing argument on the motion, the trial judge, Judge Harding, ruled in favor of Milton. In so doing, he recognized that the insurance policies were not spelled out in the record of the settlement but noted that the same was true of the other assets of the business. What was pivotal according to Judge Harding was that both parties understood that the assets of the business were being transferred from David to Milton through the transfer of David's stock in exchange for $65,000. Because the policy was clearly an asset of the business, it was transferred as well.
*359 As far as the equitable aspects of the transaction were concerned, Judge Harding opined that
what was originally contemplated was that the policy would fund the buyer, the particular partner, and if it does turn out that David Mitzner dies before Milton Mitzner, what in effect has happened is that Mr. Milton Mitzner has advanced the funds for the buy-out in advance of the death and by deriving the benefits of the policy upon the life of David Mitzner at some time in the future, if David Mitzner dies first, he will in effect be at that point then realizing the effect of what was the original intent of the buy-out. What he is doing is laying out the buy-out money and then there would be a reimbursement by the insurance proceeds, should that come into fulfillment in that way.
So that I don't find what was originally intended when the insurance was purchased is now being offended by letting Mr. Milton Mitzner continue to own them, rather the company and the potential beneficiary of Milton Mitzner, to leave that in place.
David and Joan appeal. We affirm substantially for the reasons expressed by Judge Harding in his oral opinion of June 26, 1992. We add only this. The record fully supports the conclusion that the parties were aware of the existence and purpose of the insurance policies. David's counterclaim, filed a few months prior to the settlement by the lawyer who represented him during negotiations, specifically referenced the policies. Further, the provisional director appointed by the court to run Lights 18 had directed the parties to provide him with written proof of the status of the "key man life insurance policies which they hold on each other," prior to the settlement.
Although David and Joan argue that David owns his policy, key man insurance, which reimburses an employer upon the death of a key employee or principal, is owned by the employer who also applies for and is the beneficiary of the policy. Equitable Life Assur. Soc. v. New Horizons, Inc., 28 N.J. 307, 309, 146 A.2d 466 (1958). See also Hamilton, Johnston, & Co. v. Johnston, 256 N.J. Super. 657, 670, 607 A.2d 1044, certif. denied, 130 N.J. 595, 617 A.2d 1219 (1992), for an example of the purchase of key man insurance to fund a redemption of a shareholder's stock upon the shareholder's death.
In our view, what has fueled this conflict is the nature of the disputed asset, insurance. If Joan and David had returned to *360 court after this settlement for a computer or a car or a chandelier out of Lights 18's inventory, claiming that it had not been mentioned specifically during negotiations, the speciousness of their contention would seem obvious.
The policy is a corporate asset  no more and no less. David and Joan and their lawyer were well aware of its existence during negotiations. Whether they hoped to gain an advantage by their silence or whether they were merely inattentive during negotiations, there is no reason for our intervention. Moro v. Pulone, 140 N.J. Eq. 25, 30, 52 A.2d 818 (Ch. 1947).
Affirmed.
SHEBELL, P.J.A.D., dissenting.
I must dissent from the majority. Clearly, their result is the most expedient means of resolving this litigation, however, it is impossible on this record to be satisfied that justice is accomplished by giving Milton the benefit of both life insurance policies. The majority has referred to the coverage as "key-man insurance," however, it clearly appears on the application that the insurance was purchased in order to implement a "buy-sell agreement," which the parties are now unable to locate. I mention this only because it gives credence to David's assertion that because there was no mention of the policy during negotiations, a fact which is admitted, he never even thought about the policies being involved in the sale.
Because of David's multiple sclerosis, he is unable to obtain other insurance and, significantly, the policy on his life is now a paid up $100,000 policy. There is also the policy on Milton's life, which should have substantial value, although it appears that contrary to the assertion that the corporation was the real owner, there may have been borrowing on this policy by Milton prior to the breakup of the business. What is clear is that these, if included, are the largest assets of the corporation and yet everybody admits they were never discussed in the negotiations.
*361 I am convinced that in these circumstances, the Chancery Judge should have held a hearing to determine whether or not this corporate asset, and I will so label it for purposes of this discussion, was intended by the parties to be turned over to Milton as part of the purchase of the business. It seems improbable. It is much more likely that the parties each thought they would take the policy on their own life with them when they parted company, as the policy no longer served its corporate purpose since there would not be a death of either party during the continuance of the enterprise.
In any event, I do not see how we can conclude that there was a meeting of the minds on the sparse record here. If the court intends to enforce a contract which is going to bring about the great hardship and apparent injustice which will result here, it certainly should be based upon clear and convincing evidence as to what was intended. See Brower v. Glen Wild Lake Co., 86 N.J. Super. 341, 350, 206 A.2d 899 (App.Div.), certif. denied, 44 N.J. 399, 209 A.2d 139 (1965). There was absolutely nothing placed on the record in open court at the time of this settlement which would in any way indicate that both life insurance policies were to be turned over to Milton because they might constitute a corporate asset. This is clearly a case where equity should intervene to determine what the parties intended and what relief should be granted. See Nazarro v. Globe & Republic Ins. Co., 122 N.J. Eq. 361, 364, 194 A. 141 (Ch.Div. 1937).
I would reverse and remand for further proceedings.