660 A.2d 480

MILTON MITZNER, PLAINTIFF–RESPONDENT, v.
LIGHTS 18, INC., DAVID MITZNER AND JOAN
MITZNER, DEFENDANTS–APPELLANTS.

Argued January 18, 1995—Decided June 15, 1995.

*Robert J. Cirafesi* argued the cause for appellants (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Cirafesi* and *Linda Lashbrook,* of counsel; *Ms. Lashbrook* and *Laura J. Bogaards,* on the brief).

*Adam Mitzner,* a member of the New York bar, argued the cause for respondent (*Kovacs & Rader,* attorneys; *Sanford Rader,* of counsel; *Mr. Mitzner* and *Mr. Rader,* on the brief).

PER CURIAM.

We affirm the judgment below substantially for the reasons stated by the majority members of the Appellate Division in their opinion below, which will be filed herewith and reported at 282 *N.J.Super.* 355, 660 *A*.2d 512 (1994). We add these comments.

We agree with our dissenting member, *post* at 576, 660 *A*.2d at 481, that this is a "tragic case involving a disagreement between two brothers" concerning the ownership of a "key-man" insurance policy on the life of a seriously ill and uninsurable brother. We would hope that the two brothers, Milton and David Mitzner, could resolve the dispute between themselves.

The two brothers owned Lights 18, Inc., a retail lighting business. The company purchased a $100,000 policy on the life of each of the brothers as a means of funding a buy-out upon the death of either partner. The company owned the policies and paid the premiums thereon. The brothers had a falling out that resulted in

a family lawsuit. One of the claims made was that David and his wife, Joan, mismanaged the business, causing a loss of corporate funds. We have no sense of whether the various claims were meritorious, or what value should have been assigned to any of them as part of an overall settlement.

The terms of the settlement, which encompassed all claims between all parties to the litigation, were that Milton would "buy the business for $65,000." The settlement was placed on the record in open court. After the case was settled, David sought the ownership of the $100,000 policy on his life, asserting that the parties had never intended that ownership of the life insurance policies be embraced by the settlement. David claimed that there would be a windfall to the corporation if it obtained $100,000 in death proceeds but made only a $65,000 buy-out. The Chancery Division judge disagreed:

> I'm satisfied that it was entirely clear to both parties or should have been clear to both parties that the insurance policies here were owned in the name of the business and there was a sale of the assets of the business, and while it's true that not every asset was spelled out on the record, it was intended to be a sale of the business and the assets of the business, and it seems to the Court that that had to be in the contemplation of what the parties intended, even though not particularly articulated.

Without retrying the validity of every one of the claims and cross-claims, we cannot know if the trial court's decision will result in a windfall to Milton. However, we do know that there was never any misunderstanding that the corporation owned the policies. The Appellate Division wrote: "The record fully supports the conclusion that the parties were aware of the existence and purpose of the insurance policies. * * * The policy is a corporate asset—no more and no less." 282 *N.J.Super.* 355, 359, .660 *A.*2d 512.

Two courts have carefully reviewed the factual contentions of the parties. We cannot say that those courts were mistaken in their assessment of the facts.

The judgment of the Appellate Division is affirmed.

GARY S. STEIN, J., dissenting.

This is a tragic case involving a disagreement between two brothers, one of whom is seriously ill and uninsurable, over ownership of the corporate-owned insurance policies on their lives. I understand but cannot agree with the Court's determination to affirm the decision below, which relied primarily on the trial court's sense of the record.

The underlying issue is whether Milton Mitzner's offer to purchase his brother David Mitzner's fifty-percent stock interest in Lights 18, Inc., a family-owned corporation they founded in 1972, should be understood to have contemplated that the corporation retain both of the $100,000 life-insurance policies owned by the corporation and insuring the lives of each brother. That offer, accepted by David, settled the underlying litigation between the brothers, all parties agreeing that the policies were never discussed during settlement negotiations, although both brothers were aware of their existence. Each policy has a cash value of approximately $15,000. Because of David's multiple sclerosis, his policy is fully paid; he also apparently is uninsurable. David asserts that he never intended that the settlement would result in the corporation owning the policy on his life. The Court's affirmance results in Milton effectively becoming the beneficial owner of both his and David's policy.

Although the underlying "buy-sell" agreement cannot be found, the parties agree that the policies were taken out when the corporation was formed to provide funds with which the corporation could purchase the shares of a deceased stockholder from his heirs, leaving the survivor as sole owner. No one can state whether any understanding existed at that time about the disposition of the policies in the event of sale or dissolution of the corporation.

The Appellate Division majority accepted the trial court's view that Milton's acquisition of effective ownership of both policies was not inconsistent with the brothers' original understanding:

[I]f it does turn out that David Mitzner dies before Milton Mitzner, what in effect has happened is that Mr. Milton Mitzner has advanced the funds for the buy-out in advance of the death and by deriving the benefits of the policy upon the life of David Mitzner at some time in the future, if David Mitzner dies first, he will in effect be at that point then realizing the effect of what was the original intent of the buy-out. What he is doing is laying out the buy-out money and then there would be a reimbursement by the insurance proceeds, should that come into fulfillment in that way.

So that I don't find what was originally intended when the insurance was purchased is now being offended by letting Mr. Milton Mitzner continue to own them, rather the company and the potential beneficiary of Milton Mitzner, to leave that in place.

The dissenting member of the Appellate Division panel disagreed with the basic premise of the trial court's holding, which was adopted by the majority. In Judge Shebell's view, for Milton to buy David's shares, become the sole owner of the corporation, and retain the policy on David's life so that on David's eventual death Milton could recover the proceeds and be reimbursed for the cost of buying David's shares, would be inconsistent with the brothers' original purpose. That purpose, he observed, was to fund the corporation's acquisition of a deceased stockholder's shares "during the continuance of the enterprise." Because that purpose had terminated when Milton had become the sole stockholder, Judge Shebell observed that implementation of the settlement on the basis that Milton had acquired all assets, including both policies, for the negotiated $65,000 price, would be highly inequitable. Accordingly, he concluded that the matter should be remanded to the trial court to conduct an evidentiary hearing to determine whether that result was consistent with the intent of the parties.

Although this record contains several gaps, my view of the underlying issue basically is in accord with that of the dissenting member in the Appellate Division. The underlying buy-sell agreement could not be produced, but the purpose of agreements such as the one described by the parties is well known. With the use of insurance policies as a funding mechanism, such agreements permit a corporation to acquire the shares of a deceased stockholder. The surviving stockholder benefits by the redemption of the deceased stockholder's shares, which without the insurance policy

might have been too costly for the surviving stockholder to acquire. The deceased shareholder's family benefits by receiving the insurance proceeds in exchange for the shares of the deceased shareholder. Such a buy-sell agreement, and the insurance that funds it, serves to protect only the interests of the corporation's shareholders, a function neither the agreement nor the insurance can perform if the business is sold or dissolved, or if one or more shareholders sell their stock.

Parties entering into such agreements might not contemplate what disposition would be made of the insurance policies in the event of sale or dissolution of the corporation, or sale of a shareholder's stock during a shareholder's lifetime. If the question arose, the shareholders undoubtedly would assume that each would have the right to acquire the policy on his or her life, and a well-drafted buy-sell agreement would specifically so provide. *See* 2 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 10.58, at 198–99 (3d ed. 1992). However, the parties to a standard buy-sell agreement *never* would contemplate, if one shareholder acquired another's shares while both were living, that the buyer could continue to own and receive the proceeds of the policy insuring the seller, thereby reimbursing himself for the cost of acquiring the seller's stock.

The few cases that have considered the rights of heirs of a deceased stockholder or partner to the proceeds of a policy owned by an entity that was dissolved before the death of the stockholder or partner hold that the heirs of the deceased stockholder or partner are entitled to the policy proceeds. *See Ruth v. Flynn,* 26 *Colo.App.* 171, 142 *P.* 194, 197–98 (1914); *Cheeves v. Anders,* 87 *Tex.* 287, 28 *S.W.* 274, 275–76 (1894). In *Miller v. Hall,* 65 *Cal.App.*2d 200, 150 *P.*2d 287 (1944), the partnership paid the premiums on four insurance policies—two each on the lives of each partner—that provided death benefits to each partner's heirs in the amount of $30,000. When Miller suffered a stroke the partnership dissolved, and Hall continued the business in his own name. A dispute arose over the division of assets. Miller con-

tended that each partner should receive the policies on his own life. Hall, anticipating that Miller would die first, argued that the policies should be equally divided, with each partner owning $15,000 of the insurance on his own life and on the life of the other partner. The trial court concluded that although the agreement made no provision for disposition of the policies on dissolution, the parties never had intended that "either partner should retain insurance upon the life of the other," determining that "said policies are and in equity should be the property in each instance of the partner upon whose life they are written." *Id.* at 288. The Court of Appeals affirmed, observing that each partner should receive the policies on his own life, adjusting for any differences in cash value:

> The contract between the parties regarding this insurance makes no provision for what shall be done in case of a dissolution. It does indicate an intention that neither party should ever collect and retain any proceeds of the insurance on the life of the other. It was designed to apply in the event of an interruption of the partnership business due to the death of one of the partners. Its provisions are inapplicable now since the partnership has been dissolved. Moreover, no one can now collect the insurance money, and the parties have distributed most of the assets of the firm, which the proceeds of the policies were to cover.

> The premiums having been paid by the partnership the interests of the parties in these policies at the time of the dissolution constituted a partnership asset. In an accounting between the partners, which is a matter of equity, that asset should be divided in a manner that is fair and equitable to both parties. . . .

> Under these circumstances, the most equitable way to divide this asset is on the basis of its present value, the surrender value of the policies, with an adjustment of the difference therein based upon the respective costs, and by allocating to each party the policies on his own life, thus sharing the future obligations and values. This is not only a fair division of both the present and future value, but it enables each to preserve and develop the potential value of his own policies free from any possibility of its being destroyed by any act of the other. In this way each receives a like share of the entire existing asset, and in a very real sense there is being returned to each partner that which he contributed to the partnership business.

[*Id.* at 290.]

Indeed, the unseemliness of the result sanctioned by the trial court should give us pause. Although the policies were never mentioned in the settlement negotiations, Milton will have acquired the corporate assets, including both insurance policies, for $65,000. As the trial court noted, Milton can then await his

brother's death to recover that policy's $100,000 death benefit, from which "there would be a reimbursement [of the funds that Milton had advanced for the buy-out] by the insurance proceeds, should that come into fulfillment in that way." In my view, that reimbursement would be manifestly inconsistent with the original purpose of the buy-sell agreement between the two brothers. When the corporation purchased the policies, neither brother contemplated that the corporation would retain ownership of the policies if the corporation were sold or dissolved, or if either stockholder were to acquire the other's shares. In those circumstances, the purpose for which the policies were taken out no longer would exist, and the brothers would doubtless have assumed that each would receive his own policy.

Accordingly, consistent with the views expressed by Judge Shebell, I would reverse and remand to the trial court for a determination whether both parties intended that the insurance policies be included in the acquisition that was the subject of settlement, or whether the settlement agreement was reached on the basis of a mistake concerning the disposition of the insurance policies. The trial court "reluctantly" concluded that it "should have been clear to both parties that the insurance policies here were owned in the name of the business and there was a sale of the assets of the business," observing that even if David had not intended to sell his interest in his policy, "I don't think that that can reach the level of being a mutual mistake by both parties." However, in appropriate cases involving *unilateral* mistake, rescission or reformation are remedies that are available to the adversely affected party. See *Conduit & Foundation Corp. v. City of Atlantic City,* 2 *N.J.Super.* 433, 440, 64 *A.*2d 382 (Ch.Div. 1949) (stating prerequisites for rescission based on unilateral mistake); *Volker v. Connecticut Fire Insurance Co.,* 22 *N.J.Super.* 314, 321–22, 91 *A.*2d 883 (App.Div.1952) (holding that reformation may be granted based on unilateral mistake accompanied by inequitable conduct). On this record, I am unpersuaded that the trial court adequately considered the availability of equitable

remedies to avoid a result that is fundamentally at variance with the original purpose of the brothers' buy-sell agreement.

*For affirmance*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—5.

*For reversal and remandment*—Justice STEIN—1.