Herbert MELROSE, Appellant (Cross–Claim Plaintiff below),

v.

CAPITOL CITY MOTOR LODGE, INC., Appellee (Cross–Claim Defendant below).

No. 49S00–9708–CV–444.

Supreme Court of Indiana.

Dec. 30, 1998.

Marvin Mitchell, Mitchell Hurst Jacobs & Dick, Steven K. Huffer Huffer & Weathers, P.C., Indianapolis, IN, Attorneys for Appellant.

Ronald E. Elberger, V. Samuel Laurin, III, George T. Patton, Jr., Bose McKinney & Evans, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

After a closely held corporation decided to liquidate, Smulyan, a director-shareholder, sought to purchase corporate-owned insurance policies on his life for their cash surrender value. Melrose, another director-shareholder, objected on grounds that Smulyan's life expectancy made the policies far more valuable than their cash surrender value. The trial court held that Smulyan's purchase did not violate his statutory or fiduciary duties to the corporation. We agree and affirm.

### Background

Three shareholders, Smulyan, Melrose and Rowley, owned all of the issued and outstanding shares of Capitol City Motor Lodge, Incorporated ("Capitol"). The three were also the sole directors of the corporation.[1] In 1986, the directors authorized an "Agreement for Purchase of Shares on Death" ("Buy–Sell Agreement") that required Capitol to purchase all of the shares owned by a shareholder in the event of that shareholder's death.[2] To fund the purchase of the shares,

---

1. Because the directors are also the sole shareholders in the corporation, we will occasionally refer to the directors as "director-shareholders."

2. Many closely-held corporations enter into buy and sell agreements with their principal shareholders. Generally, under such an agreement, the corporation is obligated to purchase the stock held by a shareholder in the event of his or her death. Purchasing life insurance policies on the lives of shareholders is one method for the corporation to fund such a purchase. The corporation applies for, owns, and pays the premiums on the policies and is also the named beneficiary. If

the Buy–Sell Agreement required Capitol to purchase life insurance on its shareholders, namely Smulyan, Melrose and Rowley. Pursuant to this requirement, Capitol procured five life insurance policies on Smulyans life. Three of these policies (the "Policies") were issued by National Fidelity Life Insurance Company ("National") and are the sole policies at issue in this appeal.

After engaging in business for some years, a decision was made to liquidate Capitol. On June 15, 1994, the directors approved a Plan of Liquidation and Distribution of Assets ("Liquidation Plan"). The Liquidation Plan instructed the directors to sell all of Capitol's assets. Further direction provided by the plan included:

> After the effective date, the Board of Directors and the Officers of the Corporation shall sell all of the assets of the Corporation. Any sale shall be made on the terms and conditions and for consideration that the Board deems reasonable and in the best interest of the Corporation and of its shareholders. The Board of Directors and Officers of the Corporation may execute any instruments that are necessary to transfer title to the property and assets.

Following adoption of the Liquidation Plan, steps were taken to wind up Capitol's business. On January 9, 1995, a board of directors meeting was held at which all directors were present.[3] At the meeting, Smulyan proposed the transaction that is at the heart of this case with the following resolution:

> RESOLVED, Each shareholder is given the right to purchase the policies on that shareholder's life at net cash value from Capitol City Motor Lodge, Inc. and given the right to name his preferred beneficiary.

(the "Resolution") (R. at 310.) After discussion of the proposal, Smulyan and Rowley voted in favor of the Resolution. Melrose voted against it. After the Resolution passed, Smulyan exercised his right to purchase the Policies for cash surrender value.[4] Capitol assigned all of its rights, title and interest in the Policies to Smulyan who in turn named his wife the primary beneficiary on each of the Policies.

Shortly thereafter, National received conflicting claims concerning the validity of the Resolution and the assignment of the Policies from Capitol to Smulyan. As a result, on September 19, 1995, National filed a "Complaint for Interpleader," requesting court direction as to its obligations with respect to the Policies.

On November 21, 1995, Melrose filed his answer and cross-claim maintaining, among other counts, that Smulyan (1) violated the Liquidation Plan (Count I); (2) breached a fiduciary duty owed to the shareholders (Count II); and, (3) relied upon an invalid corporate resolution when he acquired the Policies (Count III). Smulyan moved for partial summary judgment on these counts

---

the shareholder dies, the insurance proceeds received by the corporation are used to purchase the deceased shareholder's stock in the corporation. *See generally,* 1 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations,* § 7.46 ( 3d ed.1991). The Buy–Sell Agreement referred to in the text was such an agreement. It provided in part:

> In the event of the death of any Shareholder, Corporation shall purchase and agrees to purchase all of the Shares owned by such Shareholder at the times [sic] of his death or otherwise subject to sale and purchase hereunder at his death, and each Shareholder agrees for himself and on behalf of his heirs, administrators, executors, successors and assigns, and transferees of Shares formerly owned by the deceased Shareholders if such transferees received such Shares pursuant to subparagraphs (a), (b), or (c) of Paragraph 1 of the Buy and

> Sell Agreement, to sell all of such Shares to Corporation....

(R. at 348–49, *Agreement for Purchase of Shares on Death,* ¶ 1.)

3. Smulyan, Melrose and Rowley were both the sole directors and the sole shareholders in the corporation at this time. Smulyan owned one-half of the stock (½), Melrose owned one-third of the stock (⅓), and Rowley owned one-sixth (⅙) of the stock at the time of the meeting.

4. At various places in the record, the price at which Smulyan purchased the Policies is referred to as "net cash value" and "cash surrender value." For purposes of this opinion, the terms are synonymous. We elect to use "cash surrender value" by which we mean the amount an insurer will pay upon cancellation of a life insurance policy before death. *Black's Law Dictionary* 217 (6th ed.1990).

and on March 18, 1996, the trial court granted summary judgment in favor of Smulyan.[5]

Finding the Resolution valid, the court required National to honor the assignment of the Policies to Smulyan. The court further found that directors Smulyan and Rowley did not breach a fiduciary duty owed to either Melrose or Capitol by voting in favor of the Resolution nor, in so doing, had the board of directors breached the Liquidation Plan.

After the trial court made its partial summary judgment final, Melrose promptly appealed to the Court of Appeals. This Court granted transfer pursuant to Ind. Appellate Rule 15(M).

### Discussion

We are presented with the following issues: (1) whether Ind.Code § 27–1–12–17, a provision of the Insurance Code, preempts provisions of general corporate law concerning transactions involving insurance on the lives of corporate shareholders and directors; and (2) whether the purchase of corporate-owned life insurance by the insured for its cash surrender value violates the corporate conflict of interest statute, Ind.Code § 23–1–35–2, or breaches a shareholder's fiduciary duty to fellow shareholders.

### I

Melrose asserts that in granting summary judgment in favor of Smulyan, the court implicitly held that "insurance policies are a unique type of asset, not subject to the usual rules of corporate governance." Appellant Br. at 28. Smulyan urges us to uphold the Resolution passed by the board of directors pursuant to Ind.Code § 27–1–12–17.[6] Ind. Code § 27–1–12–17 (1993). Smulyan contends that the last paragraph of Ind.Code § 27–1–12–17 validates the Resolution and exempts him from any conflict of interest claims under the Indiana Business Corporation Law: "No person shall, by reason of interest in the subject matter, be disqualified from acting as a director, or as a member of the executive committee of such corporation on any corporate act touching such insurance." Ind.Code § 27–1–12–17 (1993). Such a determination would necessarily rest on the premise that this provision of the Insurance Code trumps a director's corporate obligations under Indiana's Business Corporation Law.[7] We are not prepared to draw such a conclusion.

▮▮▮▮ The Indiana Business Corporation Law applies to all domestic corporations closely held and public corporations alike. See Ind.Code Ann. §§ 23–1–17 (Introduction) & 23–1–17–3(a) (West 1989). Title 23 sets forth corporate director duties, responsibilities, and standard of conduct expected of corporate directors. See Ind.Code §§ 23–1–35–1 to 23–1–35–4. Title 27, on the other hand, specifically applies to any organization operating, representing or attempting to do insurance business in Indiana. See Ind.Code § 27–1–2–2 (1993). Chapter 12 thereof addresses life insurance policy requirements

---

**5.** Mr. Smulyan died on October 1, 1996. The trial court substituted Smulyan's personal representatives as parties to these claims on January 21, 1997.

**6.** The statute reads in its entirety as follows:

Any corporation organized under the laws of this state may, when authorized by its board of directors, or its executive committee, cause to be insured, for its benefit, the life of any of its directors, officers, agents or employees, and to pay the premiums for such insurance; and may continue to pay such premiums after the insured shall cease to be such a director, officer, agent or employee of such corporation.

Due authority for such corporation to effect, assign, release, convert, surrender, or take any other action with reference to such insurance, shall be sufficiently evidenced to the insurance company by a certificate to that effect by the secretary, or other corresponding officer of

such corporation under its corporate seal. Any such certificate shall protect the insurance company for any act done or suffered by it upon the faith thereof, without further inquiry into the validity of the corporate authority or the regularity of the corporate proceedings. The beneficiary in such a policy shall not be changed except with the consent of such corporation, beneficiary, effecting such insurance.

No person shall, by reason of interest in the subject matter, be disqualified from acting as a director, or as a member of the executive committee of such corporation on any corporate act touching such insurance.

Ind. Code § 27–1–12–17(1993).

**7.** The Indiana Business Corporation Law is comprised of Indiana Code §§ 23–1–17–1 through 23–1–54–3.

and confers certain rights, powers and privileges on the life insurance company. Ind. Code § 27–1–12–1 (1993). Nevertheless, our ultimate determination as to which statute governs in this instance rests on principles of statutory construction. Our main objective in statutory construction is to determine, effect and implement the intent of the legislature. *Sullivan v. Day,* 681 N.E.2d 713, 717 (Ind.1997); *Freeman v. State,* 658 N.E.2d 68, 70 (Ind.1995); *Matter of Lawrance,* 579 N.E.2d 32, 38 (Ind.1991); *Superior Constr. Co. v. Carr,* 564 N.E.2d 281, 284 (Ind.1990). Where two statutes presumably relate to the same subject matter, we attempt to construe the statutes so that both can stand. *Kramer v. Beebe,* 186 Ind. 349, 355, 115 N.E. 83, 85 (1917).

■ We find that the purpose of Ind.Code § 27–1–12–17 is to limit a life insurance company's duty of inquiry into the validity of corporate authority or the regularity of corporate proceedings in a transaction involving insurance on the life of a general business corporation's directors, officers, agents or employees. The life insurance company is entitled to good faith reliance on a proper corporate certificate.

■ It is true that the language of Ind. Code § 27–1–12–17 authorizes general corporations to purchase insurance on the lives of directors, officers, agents and employees (including individuals who participate in the decision to purchase the insurance) and to maintain that insurance even after the insured's service to the corporation ceases. But in light of the overall purpose of this section, we believe this language simply makes clear that a life insurance company need not inquire as to whether a corporate customer is acting *ultra vires* in purchasing or maintaining life insurance in any of the circumstances specified. This simply reinforces the limited extent of an insurance company's duty of inquiry. We find no justification to go beyond this point to hold that this language exempts such insurance transactions from the conflict of interest provisions of the Business Corporation Law and the fiduciary duty provisions of the common law. In fact, we find it highly unlikely that the legislature would have intended such an exemption without providing therefor in the Business Corporation Law.

## II

Melrose contends that the Resolution approving the sale of corporate-owned life insurance to shareholders was invalid under the conflict of interest laws governing the behavior of directors of corporations organized in this state. He further alleges that in voting to approve the sale of corporate-owned life insurance to shareholders, Smulyan breached his fiduciary duty of fair dealing owed to the corporation and fellow shareholders.

Indiana Business Corporation Law defines a conflict of interest transaction as follows:

(a) A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest. A conflict of interest transaction is not voidable by the corporation solely because of the directors interest in the transaction if any one (1) of the following is true:

(1) The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction.

(2) The material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction.

(3) The transaction was fair to the corporation.

Ind.Code § 23–1–35–2 (1993).

■ Melrose argues that the Resolution was not approved by a majority of disinterested directors nor by fully informed shareholders. Transactions between an interested director and the corporation are not automatically void or voidable merely because of a director's interest, as long as one of the conditions set forth in the subdivisions is

met.[8] (R. at 240–41.) *See* Ind.Code. 23–1–35–2(a), (b) & (c). *See also Hill v. Nisbet,* 100 Ind. 341, 353–55 (1885); 3 William Meade Fletcher et. al., *Cyclopedia of the Law of Private Corporations* § 915.10 (1994 & Supp. 1998). Subdivisions (1) and (2) provide that either the board of directors or shareholders entitled to vote may authorize a transaction where all material facts and the director's interest are disclosed. Ind.Code § 23–1–35–2(a)(1) & (2). Subdivision (3) provides that a conflict of interest transaction may stand if the transaction is fair to the corporation. Ind.Code § 23–1–35–2(a)(3).

Melrose also contends that Smulyan bore and breached a fiduciary duty owed to him and other director-shareholders. Melrose argues that Capitol is a close corporation, an "incorporated partnership," and therefore, he and Smulyan stood in a fiduciary relationship to one another. Appellants Br. at 32–33. He further contends that Smulyan profited at the expense of the corporation and to Melrose's detriment when he voted to pass the Resolution and then subsequently purchased the Policies.

■ We have defined a close corporation as one that typically has relatively few shareholders and whose shares are not generally traded in the securities market. *See Barth v. Barth,* 659 N.E.2d 559, 561 n. 5 (Ind.1995). At the time of the questioned transaction, Capitol had three shareholders who were also Capitols directors.[9] Capitols shares were not traded in the securities market. Given these characteristics, we agree with Melrose that Capitol operated as a closely-held corporation.

■ Courts have traditionally interpreted fiduciary duties differently for closely-held corporations as opposed to publicly held corporations for which most of the statutory norms were established. *See Cressy v. Shannon Continental Corp.,* 177 Ind.App. 224, 228–29, 378 N.E.2d 941, 945 (1978) (citations omitted). *See also Helms v. Duckworth,* 249 F.2d 482, 486–87 (D.C.Cir.1957); [10]

---

8. Here, all directors were "interested" because Capitol held life insurance policies on each of their lives. An interested director may vote his or her shares in a conflict of interest transaction. *See* Ind.Code § 23–1–35–2(d); Ind.Code § 23–1–35–2 (West 1989) (Official Comments to Subsection (d)). Particularly in a closely-held corporation, shareholders themselves tend to be interested in the questioned transaction as they have direct ties to and involvement in the corporation. Disqualifying their votes because of this interest "may be unworkable." 3 William Meade Fletcher, *Cyclopedia of the Law of Private Corporations* § 937 at 574 (1994). Further, Capitols Articles of Incorporation explicitly authorized interested directors to participate in actions in which they had a direct or indirect interest.

> Any contract or transaction between the Corporation and one or more of its directors or officers, or between this Corporation and any firm of which one or more of its directors or officers are members or employees, or in which they are interested, or between this Corporation and any other corporation or association of which one or more of its directors or officers are shareholders, members, directors, officers, or employees, or in which they are interested, shall be valid for all purposes, notwithstanding the presence of such director or directors at the meeting of the Board of Directors which acts upon or in reference to such contract or transaction, and notwithstanding his or their participation in such action, if the fact of such interest shall be disclosed or known to the Board of Directors and the Board of Directors shall authorize, approve and ratify such contract or transaction by the approving vote of all of the directors present. The interested director or directors may be counted in determining the presence of a quorum at such meeting. This Section of this Article XII shall not be construed to invalidate any contract or other transaction which would otherwise be valid under the common, equitable, or statutory law applicable thereto.

(R. at 240-41.)

9. During Capitol's corporate existence, it never had more than five shareholders. The shares held by these original shareholders were transferred only to the remaining three original shareholders.

10. The court explained that "[w]hile courts have sometimes declared stockholders 'do not bear toward each other that same relation of trust and confidence which prevails in partnerships,' this view ignores the practical realities of the organization and functioning of a small 'two man' corporation organized to carry on a small business enterprise in which the stockholders, directors and managers are the same persons. A distinguishing characteristic of such a corporation is the absence of a division between the stockholder-owners and the director-managers, for the former either personally manage and direct the business or so dominate the directors as to render the latter agents. Yet, the fiduciary capacity of directors and dominant or controlling stockholders is unquestioned." *Helms v. Duckworth,* 249 F.2d 482, 486–87 (D.C.Cir.1957) (cita-

1 O'Neal, *supra* note 2, § 1.20. Indiana courts have characterized closely-held corporations as "incorporated partnerships" and as such have imposed a fiduciary duty upon shareholding "partners" to deal fairly not only with the corporation but with fellow shareholders as well. *See Krukemeier v. Krukemeier Mach. & Tool, Co.,* 551 N.E.2d 885, 888 (Ind.Ct.App.1990); *Ross v. Tavel,* 418 N.E.2d 297, 304 (Ind.Ct.App.1981); *Motor Dispatch, Inc. v. Buggie,* 177 Ind.App. 347, 353–54, 379 N.E.2d 543, 547 (1978); *Cressy,* 177 Ind.App. at 228, 378 N.E.2d at 945; *Hartung v. Architects Hartung/Odle/Burke, Inc.,* 157 Ind.App. 546, 552, 301 N.E.2d 240, 243 (1973). As a result, we have held that "shareholders in a close corporation stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with their fellow shareholders." *Barth,* 659 N.E.2d at 561. *Accord Fleming v. Intl. Pizza Supply,* 676 N.E.2d 1051, 1056 (Ind. 1997) (citations omitted); *Krukemeier,* 551 N.E.2d at 888; *Dotlich v. Dotlich,* 475 N.E.2d 331, 341 (Ind.Ct.App.1985); *Hartung,* 157 Ind.App. at 552, 301 N.E.2d at 243.

The interrelationship between the conflict of interest statute and the common law of fiduciary duty in close corporations has not been the subject of judicial attention in Indiana. And given the analysis to follow, extensive treatment is not required here. We believe that if (1) the material facts of the transaction and Smulyan's interest were disclosed or known to Melrose, (2) the requisite corporate formalities necessary to authorize, approve or ratify the transaction were followed, and (3) the transaction was fair to the

corporation, the requirements of the Business Corporation Law and the common law of fiduciary duty were satisfied and summary judgment in favor of Smulyan was properly granted.

### III

### A

■ Each director had notice of the meeting and came prepared to discuss his respective plan for liquidating the corporate-owned life insurance. Smulyan proposed in the Resolution that each shareholder should have the opportunity to purchase the policies on their respective lives for cash surrender values. Melrose, through his attorney, countered with his own proposal that the policies be kept in force (owned by a liquidating trust, if necessary) and a "business decision" be made as to whether some of the policies be liquidated.[11] Under the Melrose plan, any death benefits payable or proceeds from policy liquidation would be distributed *pro rata.* Rowley, through his attorney, recommended that each shareholder be given the opportunity to purchase the policies on his respective life. In the event a shareholder did not wish to purchase his policies, the policies would be cashed in at cash surrender value and the proceeds distributed *pro rata.*[12] Following this discussion, the directors approved Smulyan's proposal by a vote of 2–1.

Melrose argues that the director-shareholders were not fully informed of all material facts because there was no "effort to determine the fair market value" of the Pol-

tions omitted). *See also Cressy v. Shannon Continental Corp.,* 177 Ind.App. 224, 378 N.E.2d 941, 945 (Ind.Ct.App.1978) (quoting *Helms,* 249 F.2d at 486–87).

11. Melrose's rationale for the proposal was succinctly stated in one of the pleadings in this litigation: "[Mr. Smulyans] life expectancy is limited. That makes the life insurance policies far more valuable than the 'cash surrender value' at which Mr. Smulyan would get to buy them under the Resolution." (R. at 392.)

12. According to the minutes of the Meeting, Mr. Rowley's attorney made the following statements with regard to the purchase of life insurance policies.

[I]t did not make economic sense to maintain these policies since the premiums over the next eight years would add up to the death benefit. Thus, he proposed that the Corporation first ask each of the individual insureds if they wanted their policies and in the event the insured did not want to keep their policy in force, to cash in the policy and distribute the proceeds.

(R. at 199.) We presume that "cashing in" the policies means recovering their cash surrender value. The same language was used by Fran Jacoby, a life insurance agent in Indiana, in her affidavit.

icies.[13] We express some skepticism about the application of the phrase fair market value to life insurance in that it may only be owned by a person with an insurable interest in the insured life. As such, its market is a limited one. Appellant Br. at 24. This contention that the Policies carried a greater value than what Smulyan tendered does not create a genuine issue of material fact as to whether the shareholders were not fully informed. There is no question but that the director-shareholders were aware that the value of the Policies to Smulyan was greater than the cash surrender value. But a majority of director-shareholders authorized a valuation of all life insurance policies at cash surrender value. And valuing the policy at cash surrender value has been held to be an equitable method of division of corporate-owned life insurance. *See Miller v. Hall*, 65 Cal.App.2d 200, 150 P.2d 287, 290 (Cal.Ct.App.1944) (court awarded each partner the previously partnership-owned life insurance policy on his life for cash surrender value). We decline to mandate that the director-shareholders had an obligation to obtain precise actuarial valuations of the Policies when they were under no obligation to so value the Policies. *See Krukemeier*, 551 N.E.2d at 890 & n. 7 (pursuant to a repurchase agreement, the court ordered the repurchase of stock at book value conclud-

ing that "it is for the parties, not the court, to establish a valuation method.... ").

We find as a matter of law that the material facts of the transaction and Smulyan's interest therein were disclosed or known to Melrose and that the requisite corporate formalities necessary to authorize, approve or ratify the transaction were followed.[14]

### B

■ We also find that Smulyan's purchase of the Policies was fair to the corporation given that the business purpose for maintaining the Policies no longer existed. In doing so, we do not make any statement on the fairness of a corporate insider's purchase of corporate assets in different circumstances. Our conclusion is limited to the purchase by a shareholder of corporate-owned insurance on the shareholder's life where (1) the insurance was originally purchased to fund a "buy-sell" agreement, (2) the corporation has decided to liquidate or dissolve, and (3) the same opportunity is available to all shareholders.

Capitol was dissolving. It is clear from the Buy–Sell Agreement that the purpose of the Policies was to fund the purchase of a deceased shareholder's interest in Capitol.[15] Unfortunately, neither the Buy–Sell Agreement nor the Liquidation Plan described the

---

**13.** Based on the affidavit of an "insurance expert," Melrose contends that the Policies were worth "conservatively at least $300,000." Appellant Br. at 28. In support of his contention that the Policies should carry a fair market value, Melrose turns to federal tax regulations and cases that have held that the fair market value of a life insurance policy for tax purposes is not necessarily its cash surrender value. Appellant Br. at 27 (citing 26 C.F.R. § 25.2512–6; *Estate of DuPont v. C.I.R.*, 18 T.C. 1134, 1952 WL 201 (1952)).

We express some skepticism about the application of the phrase "fair market value" to life insurance in that it may only be owned by a person with an insurable interest in the insured life. As such, its "market" is a limited one.

**14.** Melrose additionally asserts that the Resolution was not approved by a *majority* of directors because Mr. Rowley lacked the mental competence to vote on the Resolution. Appellant Br. at 22. Melrose contends that such a finding would render the Resolution invalid for lack of a

majority vote by the directors pursuant to Ind. Code § 23–1–35–2(a). Rowley and his attorney was present; the attorney made proposals on his behalf; Rowley voted on the Resolution; and Melrose made no objection to Rowley's participation. The only "evidence" of Rowley's alleged incompetence is Melrose's opinion thereof expressed in an affidavit prepared for this litigation. Under these circumstances, we decline to find any genuine issues of material fact as to Rowley's competence.

**15.** In fact, the Addendum to Agreement for Purchase of Shares on Death summarized the purpose of the Buy–Sell Agreement. "The [Buy–Sell] Agreement provides that in the event of death of one of the shareholder's, the corporation shall purchase from the decedent's estate the deceased shareholder's share in Corporation." The "Addendum to Agreement for Purchase of Shares on Death" was agreed to in 1991. The Addendum included a method of payment to a deceased's estate including adjustments for loans made to the corporation or debts owed to the corporation.

disposition of the Policies in case of corporate dissolution.

The literature suggests that where parties enter into buy-sell agreements, they routinely fail to include a contingency for the disposition of life insurance policies in the event of a dissolution or sale of a shareholders stock during the shareholder's lifetime. *See* 1 O'Neal, *supra* note 2, § 7.44, at 194. O'Neal proposes that "[a] well drafted agreement would provide for such contingencies, typically by giving the shareholders the right to acquire any policy on his or her own life." *Id.* (citing *Mitzner v. Lights 18, Inc.*, 282 N.J.Super. 355, 660 A.2d 512 (1994), *affd.* 140 N.J. 573, 660 A.2d 480 (1995) (Stein, J., dissenting)). A few cases have, in some form, addressed the disposition of life insurance policies upon dissolution of a partnership or corporation. *See Elliott v. Metropolitan Life Ins.*, 116 Ind.App. 404, 64 N.E.2d 911 (1946); *Mitzner*, 660 A.2d at 480 (Stein, J., dissenting); *Miller*, 150 P.2d at 287; *Cheeves v. Anders*, 87 Tex. 287, 28 S.W. 274 (1894).

The Indiana Court of Appeals held that "two partners had the clear legal right to make an oral agreement to the effect that, upon the dissolution of the partnership, each partner should take and keep as his own personal property the policy of insurance issued upon his own life." *Elliott*, 116 Ind. App. at 420–21, 64 N.E.2d at 917. In *Elliott*, the partners executed a written agreement outlining the terms of the dissolution. The policies of insurance on each partners life were not mentioned in the agreement. Because the partners previously discussed maintaining control of their own life insurance policy, and subsequently had possession of the policies, the court concluded that each partner was entitled to keep the policy issued upon his own life as his own personal property. *Id.* at 418–21, 64 N.E.2d at 916–17.

Similarly, a California court awarded each partner the insurance policy on his own life for the cash surrender value of the policy. *Miller*, 150 P.2d at 290. In *Miller*, a partnership paid the premiums on insurance policies for the partners. When Miller suffered

a stroke, his partner, Hall, purchased the business from Miller and continued the business in his own name. Miller contended that each partner should receive the policies on his own life while Hall, anticipating that Miller's policy would mature first, argued that the policies should be equally divided, with each partner owning not only an interest in the policy on his own life, but an interest in the other partner's life insurance policy. *Id.* 150 P.2d at 290. The trial court concluded, and the appellate court agreed, that

> it was the intent and purpose of the parties that said policies should be carried for the mutual protection of the partners and their families; that it was not intended that either partner should retain insurance upon the life of the other, but that ultimately the proceeds of said policies should go to the family of each insured, respectively; that said *policies are and in equity should be the property in each instance of the partner upon whose life they are written.* . . .

*Id.* at 288 (emphasis added). The court further found that the buy and sell agreement "was designed to apply in the event of an interruption of the partnership business due to the death of one of the partners. Its provisions are inapplicable now since the partnership has been dissolved." *Id.* at 290.

The New Jersey Supreme Court, however, concluded that the sale of corporate assets included the transfer of life insurance policies to the purchaser. *Mitzner*, 660 A.2d at 481. In *Mitzner*, two brothers owned and operated a retail lighting business as a closely-held corporation. The company purchased and paid premiums on life insurance policies held on the life of each brother to fund a buy-out upon the death of either brother. After a family dispute, one brother filed for involuntary dissolution which led to a settlement permitting one of the brothers to purchase the other's share of the corporation. However, the purchaser insisted that the settlement included the acquisition of all life insurance policies.[16] *Id.* 660 A.2d at 481. The Court held that since there was no misunderstand-

---

16. The brother seeking to gain ownership of the policy on his life was seriously ill and uninsura- ble. *Mitzner,* 660 A.2d at 480.

ing that the corporation owned the insurance policies, the policies were corporate assets. As such, the sale of corporate assets included the transfer of the insurance policy to the purchaser. *Id.*

In a lengthy dissenting opinion, Justice Stein argued:

> In my view, that reimbursement would be *manifestly inconsistent with the original purpose of the buy-sell agreement* between the two brothers. When the corporation purchased the policies, neither brother contemplated that the corporation would retain ownership of the policies if the corporation were sold or dissolved, or if either stockholder were to acquire the others shares. In those circumstances, *the purpose for which the policies were taken out no longer would exist, and the brothers would doubtless have assumed that each would receive his own policy.*

*Id.* at 483 (emphasis added).

We find it unnecessary to agree with Justice Stein as to whether such policies would be held to be corporate assets in a corporate asset sale in Indiana. But his analysis has particular force in the dissolution context. And each of these cases makes clear that corporate-owned insurance on shareholders' lives purchased to fund buy-sell agreements has a character distinct from normal capital or operating assets. It exists for the dual purpose of protecting the corporation and the shareholders' respective estates. And when the corporation's need for the insurance ceases, making it available to the shareholders for its cash surrender value, at least where there is full information and adherence to corporate formalities, is imminently fair and reasonable.

When Capitol purchased the Policies, a business purpose existed the proceeds from the Policies were to fund the purchase of a deceased shareholder's interest in the corporation. When Capitol voted to liquidate, the original business purpose for the Policies became obsolete. *Accord Miller*, 150 P.2d at 290. Pursuant to the Resolution,

each shareholder became entitled to acquire the policy on his own life by tendering the cash surrender value of his policy. When a close corporation has voted to liquidate, it is lawful for the corporation, at least where there is full information and adherence to corporate formalities, to sell to a shareholder corporate-owned insurance on the shareholder's life for its cash surrender value where the insurance was originally purchased to fund a buy-sell agreement.[17]

### Conclusion

Having previously granted transfer to this Court, we now affirm the judgment of the trial court in granting summary judgment in favor of Smulyan.

SHEPARD, C.J., and DICKSON, and SELBY, JJ., concur.

BOEHM, J., not participating.

---

17. Given this conclusion, it was lawful for Smulyan and Rowley to reject Melrose's offer, made by his attorney at the January meeting, to purchase the Policies for $5,000 more than their cash surrender value.