ATTORNEY FOR APPELLANT

Todd J. Kaiser
Christopher C. Murray
Amanda Couture
Ogletree, Deakins, Nash, Smoak, &
Stewart, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Eric S. Pavlack
Colin E. Flora
Pavlack Law, LLC
Indianapolis, Indiana



FILED
Jul 22 2016, 9:04 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gregg Appliances, Inc., and HHGregg, Inc., <br><br> *Appellant-Defendant,* <br><br> v. <br><br> Dwain Underwood, on behalf of himself and all others similarly situated, <br><br> *Appellee-Plaintiff.* | July 22, 2016 <br><br> Court of Appeals Case No. 49A04-1509-PL-1434 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Robert R. Altice, Jr., Judge <br><br> Trial Court Cause No. 49D05-1302-PL-7683 |

**MAY, Judge**

[1]     Dwain Underwood and other senior managers at HHGregg, Inc. ("Gregg") brought a class action after Gregg did not pay them bonuses based on Gregg's 2012 earnings before interest, taxes, depreciation, and amortization ("EBITDA").  Gregg asserted its EBITDA was below the threshold level for payment of the bonuses, but its calculation of EBITDA excluded nearly forty million dollars in life insurance proceeds it received after its executive chairman

died. The trial court granted summary judgment for Underwood after determining a Total Rewards Statement ("TRS") Gregg provided, indicating what level of EBITDA would result in bonuses, required the EBITDA to include the insurance proceeds. As the life insurance proceeds Gregg received that year were properly excluded from EBITDA, Gregg was not obligated to pay the bonuses.[1] We therefore reverse and direct entry of summary judgment for Gregg.

## Facts and Procedural History[2]

Gregg has an annual incentive plan for certain management employees. The plan is based on Gregg's annual performance and the achievement of that year's financial objectives. Certain high-level Gregg employees make recommendations as to whether the incentive should be paid, and in what amount, but the compensation committee of the board of directors has the sole authority to authorize incentive compensation payments in any given year.

The incentive is determined using EBITDA. At the beginning of fiscal year 2012, the class members were provided a document called Total Rewards Statement ("TRS"). (Appellant's App. at 411.) The TRS indicated bonuses would be paid at one of three levels based on EBITDA. A "threshold"

---

[1] As we so hold, we need not address Gregg's alternative argument the TRS was merely an informational statement and not a contract that could have required it to pay bonuses.

[2] We heard oral argument at the Indiana Statehouse on June 29, 2016. We commend counsel on the quality of their oral advocacy.

EBITDA of $112,300,000 would result in a bonus of $12,500. The "target" EBITDA of $129,500,000 would result in a $25,000 bonus. And a "maximum" EBITDA of $144,700,000 would result in a bonus of $30,000. Included as part of the TRS and on the same page as the chart indicating the possible bonus amounts was a letter from Gregg's president and CEO, Dennis May.

[4] The letter referred to the company's expansion and said "the impressive effort put forth by you and your associates was the critical difference in making this expansion" successful. (*Id*.) It noted the company's "performance level" would permit payment of "59% of your 2011 Annual Incentive Target," (*id*.), and that the company's future success "relies heavily on improving our performance." (*Id*.)

[5] During that fiscal year, Gregg's Executive Chairman of the Board, Jerry Throgmartin, died. Gregg held a forty-million-dollar life insurance policy for him. Gregg did not include the proceeds of that policy when it calculated the 2012 incentive pay because those proceeds represented a one-time event that did not reflect the company's performance.[3] Gregg's Proxy Statement for fiscal 2012 showed an EBITDA of $143,552,000, which exceeded the "target" amount and would have resulted in a $25,000 bonus. But the proxy statement also showed an "adjusted EBITDA," (*id*. at 367), which indicated the

---

[3] The chart in the TRS refers to "FY2012 *Incentive – EBITDA*." (Appellants' App. at 411) (italics added). We agree with Gregg that the intent of "incentive" pay is to "reward company-wide growth and profitability. It is not intended to reward senior management for the death of key personnel." (Reply Br. of Appellants, Gregg Appliances and HHGREGG, Inc. at 7.)

$40,000,000 in life insurance proceeds was subtracted from the EBITDA. The "adjusted EBITDA" was below the threshold level, and based on that amount Gregg paid no bonuses.

[6] Underwood and other senior managers brought a class action claiming the insurance proceeds should have been included in the incentive pay calculation and he and the class members should have been paid a bonus based on the inclusion of the insurance proceeds. Underwood and Gregg both moved for summary judgment. The trial court denied Gregg's motion and granted Underwood's. We accepted jurisdiction over this interlocutory appeal.

## Discussion and Decision

[7] Summary judgment orders are reviewed *de novo*, and a reviewing court applies the same standard of review that is applied by the trial court. *AM Gen. LLC v. Armour*, 46 N.E.3d 436, 439 (Ind. 2015). The movant must show the designated evidence raises no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id*. On that showing, the nonmoving party then has the burden to show there is a genuine issue of material fact. *Id*. All reasonable inferences will be construed in favor of the nonmoving party. *Id*. That the parties have filed cross-motions for summary judgment does not alter our standard of review. *Floyd Cty. v. City of New Albany*, 1 N.E.3d 207, 213 (Ind. Ct. App. 2014), *trans. denied*.

[8] The trial court made findings and conclusions in support of its entry of summary judgment. We are not bound by such findings and conclusions, but they aid our review by providing reasons for the decision. *Allen Gray Ltd. P'ship IV v. Mumford*, 44 N.E.3d 1255, 1256 (Ind. Ct. App. 2015). We will affirm a summary judgment on any theory or basis found in the record. *Id.*

[9] For purposes of our analysis, we assume without deciding that the language in the TRS was a contract between Gregg and its employees. Summary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law. *Rice v. Meridian Ins. Co.*, 751 N.E.2d 685, 688 (Ind. Ct. App. 2001), *trans. denied*. When we interpret contract provisions, our goal is to enforce the intent of the parties as provided in the contract. *Id.* If the language is clear and unambiguous, we give that language its plain and ordinary meaning and enforce the contract according to its terms. *Id.* A contract is to be read as a whole when trying to ascertain the parties' intent, and we will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* We must accept an interpretation of the contract that harmonizes its provisions, as opposed to one that causes the provisions to conflict. *Id.*

[10] The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone. *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1062 (Ind. Ct. App. 2009), *reh'g denied*. In determining the intention of the parties, a

contract should be considered in light of the surrounding circumstances when it was made. *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012). Specifically, we should consider the nature of the agreement, the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. *Id.*

[11] It is clear from the language in the TRS that the parties could not have intended life insurance proceeds would be included in EBITDA for purposes of determining a performance-based "incentive" bonus. (Appellants' App. at 411.) The TRS includes a letter from Gregg president and CEO Dennis May to Underwood, a table showing 2011 compensation, and a table showing 2012 targets. We examine all three parts in determining the intention of the parties, as our Indiana Supreme Court has instructed us to consider the nature of the agreement, the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. *Id.* The whole text of the contract indicates the parties intended to reward company-wide profitability, and not to "reward senior management for the death of key personnel." (Br. of Appellants, Gregg Appliances and HHGREGG, Inc. (hereinafter "Gregg Br.") at 24.)

[12]　There was evidence before the trial court[4] in the form of a Gregg representative's testimony that EBITDA is an "operating metric of performance of the overall company." (Appellant's App. at 422.) EBITDA would sometimes be adjusted when there were "items that are one time in nature" and "without adjusting for it, you would not know the true operating performance of the company on how the business is performing on a year-to-year basis. Trying to make it a more apples-to-apples comparison." (*Id*.)

[13]　The TRS letter refers to the company's growth and to the importance of "improving our performance." (*Id*. at 411.) It reflects what is being rewarded for 2011 is growth in operations, and nothing in the TRS contemplates the loss of a key leader. Life insurance proceeds do not represent "growth" that the parties could have intended to result in "incentive" bonus payments to senior executives. (*Id*.)

[14]　Gregg notes the meaning of the acronym EBITDA typically does not include "one-time, non-recurring events" like the receipt of life insurance proceeds. (Gregg Br. at 30.) That is because the term is used to measure a business's performance in the form of earnings generated by its core operations. One dictionary defines EBITDA as:

> A measure of a company's ability to produce income *on its operations* in a given year. It is calculated as the company's revenue less most of its expenses (such as overhead) but not

---

[4] Underwood did not designate any evidence.

subtracting its tax liability, interest paid on debt, amortization or depreciation. It is important to note that *EBITDA does not account for one-off or otherwise unusual revenues and expenses, only recurring ones.*

http://financial-dictionary.thefreedictionary.com/EBITDA (last visited July 6, 2016) (emphasis added). Including insurance proceeds, Gregg notes, would "paint a false picture of [Gregg's] core operating results." (Gregg Br. at 32.)

[15] Underwood's argument the TRS was intended to include the insurance proceeds as part of EBITDA is premised on Gregg's own testimony below and that "the TRS says 'EBITDA,' which includes the proceeds, not 'Adjusted EBITDA.'"[5] (Underwood Br. at 57.) Underwood says, without citation to authority, that key-man policies[6] reflect the concept that the corporation derives a pecuniary benefit or advantage from the continued life of the insured, or that the corporation will suffer pecuniary loss on the death of the insured. The nearly forty million dollars at issue did not go to Throgmartin's heirs – instead, it "went to the coffers of [Gregg] to help offset the pecuniary loss caused by his death." (*Id.* at 55.) We acknowledge Gregg suffered a loss from Throgmartin's

---

[5] As EBITDA does not, and was not in this case intended to include one-time life insurance proceeds, we believe a more useful term than "adjusted" EBITDA, on which Underwood relies, is "actual" EBITDA, as used in *In re Am. Plumbing & Mech., Inc.*, 323 B.R. 442, 457 (Bankr. W.D. Tex. 2005): "[t]he actual EBITDA, as adjusted for these insurance claims, should be $5,558,069. That is more than 90% of target EBITDA, but less than 95%, entitling Riggs to only 75% of the yearly bonus."

[6] "Key man" insurance reimburses an employer on the death of a key employee or principal. It is owned by the employer who also applies for and is the beneficiary of the policy. *Mitzner v. Lights 18 Inc.*, 660 A.2d 512, 514 (N.J. App. Div. 1994), *aff'd*, 660 A.2d 480 (N.J. 1995).

death, but we decline to hold the insurance proceeds reflected the company's performance or that of the class members.

[16] There was evidence before the trial court that Gregg has, in the past, adjusted EBITDA for one-time, non-recurring events that do not reflect the company's performance. It did so even when those adjustments resulted in higher bonuses. For example, in 2009 the company experienced some $600,000 in "asset impairments," (Appellants' App. at 74), and that money was added to EBITDA because the loss "did not reflect upon the Company's operating performance" in fiscal 2009. (*Id*.) The life insurance payment Gregg received after Throgmartin's death was such a one-time, non-recurring event that did not reflect the company's performance, and it was properly excluded from the 2012 EBITDA for purpose of determining an incentive bonus.

# Conclusion

[17] As the parties could not have intended the EBITDA on which the TRS was based would include a one-time event in the form of insurance proceeds that did not reflect the company's performance, Gregg was entitled to summary judgment. We accordingly reverse and remand for entry of judgment for Gregg.

[18] Reversed and remanded.

Baker, J., and Brown, J., concur.