414 P.2d 89

**HOGGAN & HALL & HIGGINS, INC., a corporation, Plaintiff and Respondent,**

v.

**Nelson W. HALL and Raymond C. Higgins, Defendants and Appellants.**

No. 10453.

Supreme Court of Utah.

May 16, 1966.

**4**

Draper, Sandack & Saperstein, Salt Lake City, for appellants.

E. M. Garrett, Salt Lake City, for respondent.

HENRIOD, Chief Justice.

Appeal from a judgment in a case tried to the court where plaintiff complained that defendants tortiously violated their duty as officers and stockholders of plaintiff corporation by an unrevealed agreement, the terms of which they accomplished, to solicit accounts of the company, then to resign therefrom, taking with them such accounts. Affirmed with costs to plaintiff.

■ At the outset it appears that defendants have leaned largely on facts favorable to themselves, to the exclusion of other facts of rather contradictory nature that appear in the record. Since plaintiff prevailed in this case, under familiar rules of appeal, this court must do the opposite.

■ The following is a fair abstract of the admissible competent evidence favorable to plaintiff on which, we think, the trial court reasonably could have made its decision:

In 1953 Hoggan and Hall formed an advertising agency partnership. In 1960 they incorporated. In 1963, about six months before the events transpired which gave rise to this litigation, Higgins became a stockholder and director therein, bringing into the company seven accounts. He owned 5% of the stock, Hall 20% and Hoggan 75%. In December 1963, about three months after Higgins joined up, the corporation lost its biggest account,—an Idaho firm that decided to transfer its advertising business to a Boise agency. This fact seems to have been the rub and the nub of this case, creating the plaintiff's claim that defendants had robbed Peter to pay two Pauls. The next month, January 1964, plaintiff suffered a loss. Next month, on February 14, Higgins requested a meeting at the close of business, in which, for three hours the three H's talked about the future of the company, Higgins taking the initiative. At this conversation Higgins suggested that Hoggan's salary be eliminated, but not Higgins' and Hall's. Hoggan responded by saying he would take any cut in salary that Higgins and Hall would take. Higgins recoiled from this suggestion and said he was leaving the company, to which Hoggan evinced no discernible grief. Hall was noncommittal as to whether he would join in Higgins' disjoinder. Higgins, after suggesting that Hoggan buy Hall out, said, "Why don't you face it, Ned? You have had it," and that "We have all the business, and all you have left is this bunch of old furniture and some money in the bank." Hoggan scoffed at Higgins' hints and said he wasn't about to go out of business. Hall remembered a dinner date which had a soothing effect on any conversational escalation.

After the next two days,—Saturday and Sunday, when few ever work any more, on Monday, February 17, two days later, Hall contacted five of the six accounts he had been processing, unbeknownst to Hoggan. He informed them all that he was leaving the company. Hall, in his testimony, admitted in talking to one customer that, "This was substantially the same conversation that I had with the previous accounts, outlining the difficulties at the agency. The loss that had been incurred. The fact that Mr. Higgins was leaving. That Mr. Hoggan had no accounts. That we were in a serious position, and that I was

leaving. Then I asked Mr. Eberhardt if he would like me to continue to service his account." When Mr. Eberhardt was questioned he said, "Mr. Hall said that Mr. Hoggan had lost his big account, and was drawing on the agency. That he and Mr. Higgins were carrying the load, in essence, and that he was breaking away from Mr. Hoggan and the agency that was set up, and wanted to know if we'd go along with the proposition. At the same time he also stated that most of the accounts he had contacted were going along with him."

This represents pretty much the same drama, with the same actor, similar supporting actors, with the same props at five different performances on the same day at different stops. It seems unnecessary to repeat the details of each which directly or impliedly rang up and down the same curtain. This all occurred prior to Hall's resignation and before leaving the company. After February 17, Hall and Higgins formed a new company and took the files for accounts which they considered "theirs" and left, operating their new business by March 1, Hall thereafter receiving $1,250 per month from the new company. Thereafter he also cancelled a T-V contract of the former company, substituting it with one for the new company.

It is difficult to go along with the urgence that there was no solicitation of the accounts or that there was no breach of a confidential relation with the corporation under such circumstances,—particularly when Hall and Higgins admitted in the record that they had on at least one occasion solicited one of the accounts to obtain its future business. This of itself confesses a tort.

■ This court has been dedicated to the principle that when a corporation is in difficulty financially, a director is duty-bound to render succor, not secession, even as a parent would its child. It is the duty of a director to protect, not poach upon its parent. We are cognizant of the fact that there are thousands of directors who are unaware of the responsibilities of their positions, and do not realize that their personal interests are subordinate to that of their corporation in case of conflict.

In deciding as we do, we would prefer to use the term "misunderstanding" or "mistake" as to fealty to that of "conspiracy." Many people are victims of an honest misunderstanding of their rights under a contract. This seems to be the kind of a case where an ounce of legal advice may have been worth a pound of judicial cure,—but strangely enough, the most honorable of people shun the doctor and die of cancer and others shy away from lawyers only to visit the referee in bankruptcy.

We think defendants' points I and II are answered above. As to point III, that if plaintiff suffered damage, it was not because of defendants' alleged tort: the lengthy dissertation as to balance sheets, lack of profits at the date of defection and improbability of making something out of the accounts is belied by the fact that in defendants' own brief it was conceded that four accounts were taken with them that were lost to the plaintiff, which had been solid and persisted for ten years, eight years, six years and four months respectively. To say that the company lost nothing by the hypothecation of such accounts because the company was having some financial difficulty is to fly in the teeth of logic,—since those very accounts may have been the difference between corporate survival or death.

This observation should take care of defendants' point that the trial court allegedly calculated damage on gross instead of net earnings for a year. A year's earnings, gross or net, cannot determine damages where agents solicit others to take their business away from their principals in favor of such agents, otherwise agents employed in a principal's banner year might designedly Pied Piper the customers, pay the profit for the past year,

intending to enjoy a handsome reward for many years to come,—a rather mousy gesture upon which courts frown.

We note with approval and cite the case of Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954). It would be difficult factually to find a case more nearly like the one here, and as difficult to find one more nearly espousing the principles we state here. The paucity of authority with respect to likeness seems to be shared only by it and this. We cite it as authority here and commend it to the reader rather than to repeat its context. We think it also disposes of the observations in Nichols-Morris Corp. v. Morris, 174 F.Supp. 691 (1959), U. S. District Court (not an appellate court), which seems to be relied on heavily by defendants, answering that case and defendants' contentions here. We commend that case also to the reader for comparability of fact and principle with the Duane case, supra, and the instant case.

We think there was no substantial error in the findings of fact that could be prejudicial to defendants, and so hold.

McDONOUGH, CROCKETT, WADE and CALLISTER, JJ., concur.