RICHARD L. HARTUNG *v.* ARCHITECTS HARTUNG/ODLE/BURKE, INC., R. DUANE ODLE AND LARRY R. BURKE.

[No. 1-1272A102. Filed September 17, 1973. Rehearing denied October 24, 1973. Transfer denied February 19, 1974.]

---

*Lewellyn H. Pratt, Applegate, Pratt & Ream,* of Bloomington, for appellant.

*Robert D. Mann, Ronald L. Chapman, Baker, Barnhart, Andrews, Baker & Mann,* of Bloomington, for appellees.

ROBERTSON, P.J.—The defendant-appellant (Hartung) is appealing the decision of the trial court awarding the plaintiff-appellees (Architects) $17,500 damages for breaching his fiduciary duty to the plaintiff corporation and requiring Hartung to contribute $1,362.32 as his co-guarantor's share of a note.

The corporation Architects Hartung/Odle/Burke, Inc., was organized under the Indiana General Corporation Act (IC 23-1-1-1, *et seq.* Ind. Ann. Stat. § 25-101 *et seq.* [Burns 1970] in mid-February 1971. It was the successor to Richard L. Hartung and Associates, a sole proprietorship headed by Hartung, which had been in existence for approximately seven years prior to incorporation. Odle and Burke, architect em-

ployees of Hartung, joined with Hartung as incorporators. Each served as an officer, a director, and an equal shareholder in the new corporation. As the proprietor of the corporation's predecessor, Hartung was the "contact" or "front" man—the link between the firm and its clients. Upon incorporation, the clients of the proprietorship were assigned to the corporation, and Hartung, who was elected president, remained the "front" man. The offices rented by the proprietorship were also assigned and became the corporate offices.

Discord arose shortly thereafter, with Hartung resigning as president and director approximately four months later.

Odle and Burke individually and as corporate officers filed suit against Hartung for the previously mentioned damages and contribution as well as other relief not involved in this appeal.

The first of the two issues urged by Hartung's overruled motion to correct errors is directed to his contribution as a co-guarantor on two corporate notes. On March 5, 1971, the corporation executed a promissory note for $6,000 payable to the Bloomington National Bank. Another note was executed to the bank on May 20, 1971, but only for $3,000. The funds borrowed with these notes were used for salaries of the three participants in the corporation and for operating expenses. Because the corporation was young and its survival capacity at least questionable, the bank reduced its risk by obtaining the personal guaranties of payment, as opposed to collection, of Hartung, Odle and Burke on the notes.

The notes became due on September 5, 1971, but the corporation defaulted and was unable to make payment at that time. Attempts at re-negotiation failed, and on December 22, 1971, the bank made a demand on the corporation and on the co-guarantors for payment. Further negotiations by Odle and Burke with the bank resulted in the two, in order to avoid a lawsuit, paying the bank on February 29, 1972, $1,478.79 in corporation money and $850 each from their

personal funds. This satisfied the $3,000 note. As for the $6,000 note, Odle and Burke executed a note to a third party secured by a first mortgage on their real property. They paid off this debt with their own money on March 6, 1972. Hartung refused to contribute in the satisfaction of either debt even though he was a co-guarantor on both.

Hartung erroneously asserts that a co-guarantor of a note cannot be forced to contribute when the principal obligor has sufficient funds to pay the note. Indiana's Uniform Commercial Code disposes of the issue by saying:

" 'Payment guaranteed' or equivalent words added to a signature mean that the signer engages that if the instrument is not paid when due he will pay it according to its tenor without resort by the holder to any other party." IC 26-1-3-416(1), Ind. Ann. Stat. § 19-3-416(1) (Burns 1964).

Under this statute, when the corporation failed to pay the notes when due, on September 5, the co-guarantors, Hartung, Odle and Burke, became liable for the amounts of the two notes. The liability attached regardless of the financial condition of the principal debtor-corporation and a demand by the bank on the corporation for payment was unnecessary. Case law prior to enactment of the UCC is not at variance with the UCC on this point. See *Hamilton* v. *Meiks* (1936), 210 Ind. 610, 4 N.E.2d 536; *Taylor* v. *Taylor* (1878), 64 Ind. 356; *Stiefler* v. *McCullough* (1931), 97 Ind. App. 123, 174 N.E. 823.

Hartung's argument regarding a fiduciary duty progresses in three parts. First, he claims the evidence was insufficient to establish a fiduciary duty on his part. Secondly, if such a duty did exist, the evidence does not show it to be breached. Finally, if it was breached, the evidence was deficient in that it failed to show specific, non-speculative and non-conjectural damages.

As for the existence of a fiduciary duty, the evidence shows that Hartung was a director, an officer, and one of only three shareholders of the corporation. A fiduciary duty attached to Hartung in each capacity. A director has long been held to be a fiduciary in Indiana; *Hill* v. *Nisbet* (1885), 100 Ind. 341; *Tower Recreation, Inc.* v. *Beard* (1967), 141 Ind. App. 649, 231 N.E.2d 154; *Schemmel* v. *Hill* (1930), 91 Ind. App. 373, 169 N.E. 678; and so has an officer, *Central Railroad Signal Co.* v. *Longden* (7th Cir. 1952), 194 F. 2d 310; *Leader Publishing Co.* v. *Grant Trust and Savings Co.* (1915), 182 Ind. 651, 108 N.E. 121. In addition, the shareholders in a close corporation, also referred to as an "incorporated partnership", stand in a fiduciary relationship to each other. See *Helms* v. *Duckworth* (D. C. Cir. 1957), 249 F. 2d 482; *Manis* v. *Miller* (1967), 19 N. Y. 2d 875, 280 N. Y. S. 2d 675, 227 N.E.2d 596; H. HENN, LAW OF CORPORATIONS § 268 (2d ed. 1970); *Conway, The New York Fiduciary Concept in Incorporated Partnerships and Joint Ventures* (1961), 30 FORDHAM L. REV. 297.

The nature of the fiduciary duty is basically the same regardless of the capacity in which it arises. The fiduciary must deal fairly, honestly and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests. *Helms* v. *Duckworth, supra; Leader Publishing Co.* v. *Grant Trust and Savings Co., supra; Schemmel* v. *Hill, supra.*

Hartung contends that the nature of the corporation—an "incorporated partnership" comprised of professional people—prevented a fiduciary duty from arising. Professionals are involved in the service of clients as opposed to the manufacture of goods, and, as such, Hartung contends they must be given more leeway in their relationship with their associates. He argues that too strict a fiduciary duty would unduly restrict the freedom of action that a professional person needs

to maintain. He points out that the corporation herein was formed by three professionals who previously had worked together in an employer-employee relationship, and further, that the corporation lasted only 126 days.

Hartung offers no authority for his proposition and this court is aware of none. The officer/director/shareholder of an "incorporated partnership" composed of professional architects owes a fiduciary duty to the corporation and to his business or professional associates. The critical factor giving rise to such a duty should not be the nature of the work product of the corporation, rather it should be the relationship expected by the principals to exist between themselves and the corporation and each other. Regardless of the fact that one of the principals was the former employer of the other two, the duty to deal fairly, honestly, and openly is present; and perhaps, in view of the trust and reliance the two former employees are likely to place in their former employer, a higher standard of duty is owed by the former employer.

Hartung further contends that he did not owe a fiduciary duty to the corporation or his associates at the time of the alleged breach because he had resigned on June 15, 1971, before the occurrence of the acts constituting the alleged breach. On that date he first informed Odle and Burke that he desired to withdraw from the corporation.

The facts are clearly contrary to Hartung's contention of a June 15 resignation date. Hartung's handwritten letter of resignation was dated July 1, 1971. He testified on direct examination by plaintiffs that he resigned on July 1. Plaintiff Burke testified on cross-examination that on "June 15 Mr. Hartung came in and said that he was leaving the corporation come hell or high water by the first of July. . . ." In addition, Hartung's activities subsequent to June 15 were not entirely consistent with severance from the corporation. The evidence shows that he continued to work

on corporate projects at the corporate office after June 15, as did plaintiffs Odle and Burke. The evidence also shows that Hartung did not resign as a director until July 9.

Having found that Hartung did owe a fiduciary duty at the time of the occurrence of the alleged breach, we now examine the evidence supporting the trial court's finding of said breach.

On June 26, 1971, Hartung informed the landlady of the corporate office of the discord in the corporation, and stated his desire to retain the premises for his personal use. Before July 1, while still a corporate officer/director/shareholder, he presented to her his personal check for the July rent.

In *Leader Publishing Company* v. *Grant Trust and Savings Company, supra,* defendant was president and owner of nearly all the stock of a publishing company. The publishing company, in order to secure the payment on a bond issue, executed its mortgage to the plaintiff-trustee. The terms of the mortgage provided that the property of the mortgagor publishing company, including equipment and leases, was to be transferred to the plaintiff-trustee. Contrary to the terms of the mortgage, the publishing company leased all of its property covered by the mortgage to its president, and in addition, the president took in his own name a lease from the owner of the building in which the mortgage company was located. The Indiana Supreme Court stated:

> "General public policy prevents a person from deriving a benefit to himself or working a wrong to another through a fiduciary relationship existing between the parties. Such a transaction is constructively fraudulent and hence may be impeached between persons sustaining the relationship. Such is the character of the relationship which exists between the officers of private corporations and the corporation. They are its agents and they are governed by the rules of law applicable to other agents, and as between themselves and their principal in so far as such rules relate to honesty and fair dealing in the management of the affairs of their principal. They must not in any degree allow their

official conduct to be swayed by their private interest which must yield to official duty. (Citations omitted.) If, as in the case here, such an officer takes in his own name the title to property conveniently designed for the use of the business of the corporation and occupied by it the law will deem such an act, *prima facie*, at least, potentially fraudulent as against the corporation and the officer will at the instance of the corporation he held to hold the title as trustee for its use." 182 Ind. at 661, 108 N.E. at 124, 125.

Although *Leader Publishing Company* involved a transaction between the corporation and its president, and the instant case is concerned with an officer's transaction with a third party, we find the principles stated therein applicable to this case.

Those principles are related to another principle of corporation law, known as the "corporate opportunity" doctrine. It holds that a corporate fiduciary may not appropriate to his own use a business opportunity that in equity and fairness belongs to the corporation. See generally 3 Fletcher Cyc. Corp. (Perm. Ed.) § 861.1 (1965); HENN, *supra*, § 237; Slaughter, Corporate Opportunity Doctrine, 18 SW. L. J. 96 (1964). The particular facts and circumstances of each case must be examined to determine if the opportunity belonged to the corporation or if it is one personal to the individual. *Burg* v. *Horn* (2d Cir. 1967), 380 F. 2d 897. In the instant case the corporation had a property interest in the office space it occupied. The corporation possessed a month-to-month tenancy at the time Hartung approached the landlady, and it could be considered to have an expectancy of renewal of the lease in subsequent months free of interference by corporate personnel.

Hartung's conduct with respect to the lease of the offices occupied by the corporation was clearly in his own interest and against the interest of the corporation, and as such constituted a breach of fiduciary duty. See also *McKay* v. *Wahlenmaier* (D. C. Cir. 1955); 226 F. 2d

35; *Acker, Merrall and Conduit Co.* v. *McGaw* (1907), 106 Md. 536, 68 A. 17; 3 Fletcher Cyc. Corp. (Perm. ed) § 861 (1965).

The evidence shows other actions of Hartung which can be considered an usurpation of a corporate opportunity. On June 16, Hartung conferred with clients concerning the American Legion project and advised them of the corporate turmoil. He informed the client that he was willing to continue as their architect after his withdrawal from the corporation. The American Legion personnel decided to let the work remain with Odle and Burke personally or the new corporation to arise out of any possible reorganization.

Hartung also conferred with the client on the Key West Shrimp House project. This project became more active between June 15 and July 1, 1971. The client, who had been a client of the sole proprietorship, requested when told of the discord that Hartung proceed with the project. In response to that request, Hartung testified that he said:

> "[T]here is a fuzzy area here. So I'm not sure if you are contractually obligated to the corporation or not, but if you get your attorney to straighten it out and if it is your decision, I'm going to stay in town."

Following that conversation, counsel for the Shrimp House wrote the corporation and requested that the remainder of the project be turned over to Hartung.

The general rule is that the fiduciary cannot lure away corporate business or clients which in equity and fairness belongs to his corporation. See *Hoggan & Hall & Higgins, Inc.* v. *Hall* (1966), 18 Utah 2d 3, 414 P. 2d 89; *Schildberg Rock Products Co.* v. *Brooks* (1966), 258 Iowa 759, 140 N. W. 2d 132.

The evidence also shows that Hartung approached an employee, one James Burnham, of the corporation on June 15.

Burnham joined the corporation on or about May 3, 1971. On direct examination Burnham was asked why he stayed with Hartung after July 1:

"Q. What factors did you consider to make your decision?
A. Well after Mr. Hartung called me to his office and everything was kind of fast and furious there he called me or invited me to go to one of the local taverns with him and have a beer with him and the reasons that he did the things as he did—well he told me things about him having to look in the mirror and not be ashamed of what he saw and for him to carry on his practice as he was accustomed to and everything he had to do it without Duane and Larry . . . and we talked about the jobs that were coming up and he used percentages to explain to me how he felt the projects were going in the office. Among those was the American Legion which he told me was 99% his and also the Mormon Church addition which was 95% his and another one was the Key West Shrimp House which was no doubt his. [As for the furniture center] he told me that since he had met with Mr. Levine and had become very good friends that he was 90% sure that he was going to get that also. . . . It was obvious that Mr. Odle and Mr. Burke would have nothing to do with these. So I told him I would continue working for him. . . ."

Burnham was asked if he discussed his employment status with Odle and Burke.

"Q. Was there a conversation about your further employment about whether you were going to stay there?
A. Yes there was. I told them that under the circumstances that I had no choice but to stay with Mr. Hartung and they obviously didn't have any work to do. . . ."

Fiduciaries have been found in breach of their duty for luring away corporate personnel. See *Duane Jones* ▮ *Co.* v. *Burke* (1954), 306 N.Y. 172, 117 N.E.2d 237.

A further activity of Hartung's of which plaintiffs complained was the sending of a letter to approximately twenty

of the corporation's creditors. It was dated July 1, 1971, the day of his registration as president. This letter was sent by Hartung personally, and read:

"This letter is to inform your company that Architects Hartung/Odle/Burke, Inc. are having internal problems that do not appear to be solveable through conventional means. Distasteful as it is, I have no choice but to write this letter.

Effective July 1, 1971, please be advsied that I, Richard L. Hartung am no longer personally involved in the business transactions of H/O/B, Inc. and assume no personal liability for accounts charged after said date.

Thank you for your understanding. If you desire a further explanation I can be reached by letter or phone at my present office."

Plaintiff Burke testified that this letter caused one creditor to transact business with Odle and Burke thereafter on a cash basis only. Plaintiffs contend that the last sentence of the letter left the impression that Odle and Burke had been expelled as business associates.

Finally, we are of the opinion that the evidence supports the award of $17,500. The record reveals that subsequent to his departure Hartung received approximately $16,600 in fees on projects from clients which were previously corporate clients. Additionally, there was the inconvenience and expense of vacating the premises rented by the corporation and the expenditure by Odle and Burke of nearly one hundred hours work in terminating the corporate affairs. We cannot say, as a matter of law, that the amount of damages is either speculative or conjectural.

Judgment affirmed.

Lowdermilk and Lybrook, JJ., concur.

NOTE.—Reported at 301 N.E.2d 240.