**GEIGER & PETERS, INC. and Carl L. Peters, Appellants,**

v.

**Michael R. BERGHOFF and Lenex Steel Company, Appellees.**

No. 49A02–0509–CV–832.

Court of Appeals of Indiana.

Aug. 22, 2006.

Publication Ordered Oct. 3, 2006.

Michael F. Drewry, Michael P. Bishop, Robert J. Orelup, Biran M. Falcon, Patrick M. Miller, Drewry Simmons Vornehm, LLP, Indianapolis, IN, Attorneys for Appellants.

Michael A. Wukmer, Brian D. Gwitt, Donald R. Hostetler, Ice Miller LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Appellants–Third Party Plaintiffs Geiger & Peters, Inc. ("G & P") and Carl L. Peters ("Peters"), (collectively referred to as "Appellants"), appeal the trial court's grant of summary judgment to Appellees–Third Party Defendants Michael R. Berghoff ("Berghoff") and Lenex Steel Company ("Lenex Steel"), (collectively, "Appellees"). We affirm.[1]

### Issues

Appellants raise four issues, which we consolidate, reorder, and restate as whether the trial court erred by granting summary judgment to Appellees because genuine issues of material fact exist regarding whether:

---

1. We hereby grant Appellees' motion to strike portions of the Appendix, which include evidence that was not designated to the trial court.

(I) Berghoff owed a fiduciary duty to G & P, as a creditor of FSC;

(II) G & P, via its status as FSC's corporate guarantor, has standing to pursue a personal cause of action against Berghoff for breach of fiduciary duty; and

(III) With regard to Peters's derivative claim for tortious interference of contract, Berghoff intended to tortiously interfere with FSC and Duke Construction's business contracts.

## Facts and Procedural History

### I. Background: The Parties

The relevant facts are undisputed. G & P and Ferguson Steel Company, Inc., ("FSC") are engaged as competitors in the steel fabricating business. G & P is owned, in part, by Peters, who is also a shareholder of FSC. Apart from Peters's ownership interest in the two corporations, G & P and FSC "have no common ownership or corporate officers," and "no joint venture or similar relationships have been undertaken between the two companies for any project or contract." Appellants' App. at 107. Instead, each corporation "is a separate and distinct company and operation, with separate officers, managers, physical offices, fabrication facilities, banking relationships, bonding arrangements, customer lists, contracts and operations." *Id.*

On March 20, 2002, Peters and J. Russell Sutton ("Sutton"),[2] the other owner of FSC, in their capacity as directors, appointed Berghoff as the President of FSC. Berghoff served as FSC's president until February of 2003, and "was entrusted with the ongoing daily operations and activities of FSC." *Id.* at 106. In November of 2002, Berghoff became part owner and officer of

Lenex Steel, which is also engaged in the construction industry as a steel fabricator and supplier.

Prior to December of 2002, Marvin E. Ferguson ("Ferguson") served as a director of FSC and as an officer and owner of Marvin E. Ferguson, Inc. ("MEFI"). MEFI is engaged in the construction industry as a "steel fabrication consultant and brokerage firm." *Id.* Prior to 2003, FSC entered into a consulting agreement with Ferguson and MEFI, pursuant to which "Ferguson and MEFI were to solicit and obtain steel purchase orders and contracts on construction projects for FSC." *Id.* at 107. In particular, Ferguson and MEFI were contracted to maintain FSC's existing business relationship with Duke Construction Company and Duke/Weeks companies ("Duke Construction"), as well as to develop future and ongoing work for FSC with Duke Construction.

### II. The Controversy: G & P's Guaranty and FSC's Default

#### A. The Bank and the FSC Guaranties

In 2001, G & P tendered $3,000,000.00 to FSC as an unsecured loan, to be repaid in full by April of 2001. At the same time, FSC attempted to secure a line of credit with First Indiana Bank, N.A. (the "Bank"), to fund the working capital of FSC's business. In March of 2001, the Bank increased FSC's line of credit from $10,000,000.00 to $13,000,000.00, "so that FSC could repay G & P the [$3,000,000.00] owed." *Id.* at 108. In exchange, on April 13, 2001, G & P executed a Corporate Limited Guaranty ("Bank Guaranty"), wherein G & P agreed to guarantee "when due, whether by acceleration, anticipatory repudiation, or otherwise, each of the following . . .:

---

**2.** Sutton entered an appearance in this appeal    but did not submit a brief.

(a) The full and prompt payment of all Credit Obligations and any extension or renewal thereof, and all interest, expenses, reasonable costs of collection, reasonable attorney's fees or other obligations due in connection with or on account of such Credit Obligations up to, but not exceeding, an amount equal to the lesser of: (i) the difference between the Borrowing Base (as determined as of the date the particular Advances were made to the Borrower [i.e., FSC] giving rise to the Credit Obligations and $3,000,000.00; or (ii) $3,000,000.00; and

(b) All interest, expenses, reasonable costs of collection, reasonable attorneys' fees or other obligations due in connection with or on account of this Guaranty."

*Id.* at 175.

That same day, FSC and G & P executed an Agreement to Provide Guaranty (the "FSC Guaranty"). The FSC Guaranty provided that G & P would guarantee FSC's line of credit with the Bank "to a maximum sum of $3,000,000.00," in exchange for: (1) 2% interest per annum "on the greatest amount that [FSC's] Credit Note exceeded the Borrowing Base [i.e., $10,000,000.00] during such calendar quarter;" (2) reimbursement and indemnification for all payments made by G & P on the Bank Guaranty; and (3) an assignment of FSC's life insurance policies. *Id.* at 183. In relevant part, the FSC Guaranty contains the following provisions:

5. *Waivers and Amendments.* This Agreement may be amended or modified, and its terms or conditions may be waived, only by a written instrument executed by the parties hereto . . . .

6. *Entire Agreement.* This Agreement constitutes the entire understanding of the parties relative to the subject matter hereof and supersedes all prior agreements and undertakings between or among any of the parties relating to the subject matter hereof.

\* \* \* \* \*

9. *Term.* This Agreement shall expire one (1) year from the date of this Agreement, but may be renewed for like terms upon written agreement of the parties.

*Id.* at 184 (emphasis in original).

### B. FSC's Default and Liquidation

In the past, FSC had provided structural steel to Duke Construction on multiple commercial projects throughout central Indiana, Ohio, and other parts of the Midwest. Indeed, although FSC had numerous other customers, Duke Construction "accounted for well in excess of 50% of the FSC business at all relevant times hereto." *Id.* at 106–07. However, in the fall of 2002, Duke Construction began withdrawing its business from FSC.

In October of 2002, FSC defaulted on its line of credit with the Bank, which was guaranteed by G & P. On or about November 1, 2002, Duke Construction decided to no longer award "FSC any new fabrication and erection contracts because of [FSC's] uncertain financial position." *Id.* at 476. On November 6, 2002, in a memorandum from Berghoff to Sutton, Berghoff outlined a proposal that he believed "would result in an agreement with [the Bank] to extend [FSC's] credit facility." *Id.* at 702. In part, the memorandum provides: "Please understand that each day [FSC] [is] in suspension, [Duke Construction] gets less comfortable about our ability to service them. They have begun making plans to develop other suppliers locally and are

planning to competitively bid a small job called Harlan Freezer." *Id.*

On January 20, 2003, the Bank "commenced the liquidation of FSC because of its default on the line of credit." *Id.* at 1183. Thereafter, on January 27, 2003, Berghoff formally resigned as president of FSC.

At the time, however, Berghoff also served as President of Lenex Steel. In 2003, Lenex Steel competitively bid on and received two projects from Duke Construction that FSC had previously submitted bids for, i.e., Lebanon 12 and Hamilton 6. In his affidavit, Berghoff testified that Duke Construction is now Lenex Steel's largest customer.

### III. Commencement of the Present Litigation

#### A. The Bank's Complaint Against G & P

On January 21, 2003, and pursuant to the Bank Guaranty, the Bank filed a complaint against G & P, requesting judgment in the amount of $3,000,000.00. In response, G & P filed a third party complaint against Appellees—i.e., Berghoff and Lenex Steel—Ferguson, and MEFI (collectively, "Third Party Defendants"), claiming that the "Third Party Defendants owed G & P duties because of G & P's status as a creditor of FSC." *Id.* at 150. On March 31, 2004, G & P entered into a Mutual Release and Settlement Agreement with the Bank, settling all claims arising from the Bank Guaranty for $1,825,000.00. Pursuant to an Addendum to the Settlement Agreement, the Bank assigned to G & P "any and all of its rights, interests and entitlement in the proceeds or recovery" from any derivative claims, "to which [the Bank] as the secured creditor of [FSC] by virtue of the Credit Note, Credit Agreement and Line of Credit, may have or

claim some right, title and interest therein." *Id.* at 489.

That same day, G & P and Peters executed an Assignment Agreement, wherein G & P assigned to Peters all of its "rights, interests, privileges, benefits, remedies and claims under the [Bank Guaranty] . . . and the [FSC Guaranty,]" to the extent of a recovery of:

a. actual damages in the amount of $1,825,000.00;

b. thirty-eight percent (38%) of consequential damages (including, but not limited to attorney's fees, consultant fees and litigation costs incurred through March 31, 2004 . . . ("Consequential Damages"). . . .

*Id.* at 496. G & P did not, however, assign to Peters the other 62% of Consequential Damages. In pertinent part, the Assignment Agreement contains the following provisions:

4. [Peters] agrees to pay [G & P] the sum of $1,825,000.00. [G & P] and [Peters] agree that [G & P] is indebted to [Peters] in the amount of $2,850,000.00 represented by a certain Promissory Note. . . . [Peters] shall (in lieu of a cash payment) reduce the amount of [G & P's] indebtedness to him by $1,825,000.00 and shall endorse on the Promissory Note as partial payment thereof the amount of $1,825,000.00 upon the execution of this Agreement.

5. As further consideration for the Assignment, [G & P] shall continue to maintain the management of and control over the Lawsuit relating to the [Bank Guaranty] and [FSC Guaranty.] [G & P] shall continue to keep [Peters] informed, on a regular basis, in regards to the status of the Lawsuit.

6. As further consideration for the Assignment, the Assignor shall contin-

ue to pay all of the fees, costs and expenses (including but not limited to attorney fees, consultant fees and litigation costs) of the Lawsuit relating to the Guaranty, the Agreement and the Claims.

*Id.* at 497.

### B.  G & P's Second Amended Third Party Complaint

On May 28, 2004, Appellants filed a second amended third party complaint, i.e., the present complaint, alleging that the Third Party Defendants are liable to G & P for the $1,825,000.00 settlement payment to the Bank (the "Complaint"). In the Complaint, Appellants asserted the following causes of action against the Third Party Defendants: (1) breach of fiduciary duties owed to FSC and corporate waste, i.e., Counts III and IV; (2) tortious interference with FSC's contracts and prospective business relations with Duke Construction, i.e., Count V; (3) breach of consulting agreement by Ferguson and MEFI, i.e., Count VI; and (4) civil conspiracy, i.e., Count VII. Peters brought his claims "as Assignee under the [Assignment Agreement,] individually and in his capacity as a shareholder of FSC, and derivatively on behalf of FSC." *Id.* at 119.

G & P alleged that it has standing to bring the breach of fiduciary and corporate waste, tortious interference, breach of contract and civil conspiracy causes of action, "based upon its status as a contractual third party beneficiary and as an assignee of the Bank's rights as a secured creditor of FSC pursuant to the Settlement Agree-

ment and Addendum." *Id.* at 119.  G & P averred, for example:

As a secured creditor and guarantor of FSC, as a direct contractual party in privity with FSC pursuant to the [FSC Guaranty], and by virtue of the Settlement Agreement and Addendum, G & P has both direct rights and rights as an intended third party beneficiary of the fiduciary duties which Berghoff and Ferguson owed to FSC, and of the corporate opportunities available to FSC.

*Id.* at 126.

On November 3, 2004, the Third Party Defendants filed a motion for summary judgment on all claims asserted by G & P and on three of the causes of actions alleged by Peters, i.e., Counts IV, V, and VI. Specifically, the Third Party Defendants argued that G & P lacks standing to maintain the Complaint because it was a mere guarantor-creditor of FSC and, further, because G & P was not owed any fiduciary duties.  On February 23, 2005, Appellants filed a response in opposition to the Third Party Defendants' summary judgment motion.  On April 29, 2005, the trial court conducted a hearing on the motion for summary judgment.  Subsequently, and at the trial court's request, the parties filed their proposed findings of fact and conclusions thereon.  On June 10, 2005, the trial court entered partial summary judgment in favor of Appellees, as well as findings of facts and conclusions of law.[3]  The trial court then found that there was no just reason for delay and directed "entry of final, partial judgment against G & P and Peters on the claims designated by the Court."[4]  *Id.* at 54.  On July 11, 2005,

---

3.  The trial court did not grant summary judgment to Appellees on Peters's derivative claims against Ferguson and Berghoff for breach of fiduciary duties owed to FSC and for civil conspiracy against FSC.

4.  Indiana Trial Rule 56(C) provides, in relevant part:

A summary judgment upon less than all the issues involved in a claim or with respect to less than all the claims or parties shall be interlocutory unless the court in writing expressly determines that there is not just

Appellees filed a motion to correct errors, which the trial court denied. This appeal ensued.[5]

### Discussion and Decision

#### I. Standard of Review

On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.1999). Once the moving party has sustained its initial burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment. Ind. Trial Rule 56(C), (H). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind.1991).

▮▮▮ Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997). Specific findings and conclusions by the trial court are not required, and although they offer valuable insight into the rationale for the judgment and facilitate our review, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment. *Bernstein v. Glavin*, 725 N.E.2d 455, 458 (Ind.Ct.App.2000), *trans. denied*. Rather, a grant of summary judgment may be affirmed upon any theory supported by the designated materials.[6] *Id.*

---

reason for delay and in writing expressly directs entry of judgment as to less than all the issues, claims or parties.

5. During the pendency of this appeal, Appellants settled their claims against Ferguson and MEFI. On January 11, 2006, we granted Appellants' Motion to Dismiss the claims pertaining to Ferguson and MEFI.

6. In their brief, Appellants challenge several of the trial court's findings and conclusions pursuant to Trial Rule 52. However, in the summary judgment context, we are not governed by Rule 52 and are, thus, not constrained by the trial court's findings of fact and conclusions thereon. That said, under Trial Rule 56(C), the trial court must designate the issues and claims upon which summary judgment is granted only when summary judgment is granted upon less than all the issues. *See also Wolfe v. Stork RMS–Protecon Inc.*, 683 N.E.2d 264, 267 (Ind.Ct. App.1997). Otherwise, the rule imposes no requirement upon the trial court to specifically state the legal basis for granting summary judgment. *Id.*

Here, the trial court entered numerous findings of fact and conclusions thereon. The trial court then designated the issues and claims upon which summary judgment was granted, including:

(a) G & P's derivative claims, for itself, and as assignee of the Bank, ... for: (i) breaches of fiduciary duty owed to FSC; (ii) tortious interference with FSC's relationship with Duke; ... and (iv) civil conspiracy against FSC;

(b) G & P's claims, for itself, and as assignee of the Bank, based upon its status as a creditor and as a guarantor of FSC, ... for: (i) breaches of fiduciary duty owed to FSC; (ii) tortious interference with FSC's relationship with Duke; ... and (iv) civil conspiracy against FSC;

(c) G & P's direct claims, for itself, and as assignee of the Bank, based on contractu-

## II.  Analysis

On appeal, Appellants argue that the trial court erroneously granted summary judgment to Appellees because genuine issues of material fact exist regarding whether: (1) Berghoff owed a fiduciary duty to G & P because it was a creditor of FSC; (2) G & P, via its status as FSC's corporate guarantor, has standing to pursue a personal cause of action against Berghoff for breach of fiduciary duty; and (3) with regard to Peters's derivative claim for tortious interference of contract, Berghoff intended to tortiously interfere with FSC and Duke Construction's business contracts.  We separately address each claim of error.

### A.  Fiduciary Duty

█ Appellants first contend that "Berghoff owed fiduciary duties to G & P" as a result of its status as creditor of FSC.  Appellants' Br. at 22.  The designated evidence reveals that Berghoff served as an officer, i.e., the President, of FSC from March 20, 2002 through January 27, 2003.  As an officer, Berghoff certainly owed a

fiduciary duty to FSC. *See, e.g., Hartung v. Architects Hartung/Odle/Burke, Inc.,* 157 Ind.App. 546, 301 N.E.2d 240, 243 (Ind.Ct.App.1973) (noting that both officers and directors have long been held to be fiduciaries in Indiana).  Such duty required Berghoff to "deal fairly, honestly, and openly with his corporation and fellow stockholders" and, further, to avoid being "distracted from the performance of his official duties by personal interests." *G & N Aircraft, Inc. v. Boehm,* 743 N.E.2d 227, 240 (Ind.2001).

In the present action, however, FSC is not the party alleging that Berghoff breached his fiduciary duties as an officer of the corporation, nor can G & P—either as a corporate creditor or under the Addendum to the Settlement Agreement—maintain a derivative action on behalf of FSC because G & P and the Bank were never shareholders of FSC and do not fairly and adequately represent the interests of FSC's shareholders in enforcing the right of the corporation. *See* Ind.Code § 23–1–32–1.[7]  Rather, G & P has request-

al privity, . . . for: (i) breaches of fiduciary duty owed to FSC; (ii) tortious interference with FSC's relationship with Duke;  . . .  and (iv) civil conspiracy against FSC;

(d) G & P's claims, for itself, and as assignee of the Bank, based on its alleged status as an intended third party beneficiary of FSC for: (i) breaches of fiduciary duty owed to FSC; (ii) tortious interference with FSC's relationship with Duke;  . . . and (iv) civil conspiracy against FSC; and

(e) Peters' shareholder derivative claims against Third Party Defendants for: (i) tortious interference with FSC's relationship with Duke;  . . . and (iii) civil conspiracy by Lenex . . . against FSC.

Appellants' App. at 53–54.

Appellants challenge Finding 14 and Conclusions 2,3, 10, 13, 21–26, 37, and 45.  Because we are not bound by these findings and conclusions, we do not address the propriety

of each.  Rather, we examine the propriety of the summary judgment as a whole and will affirm if it is sustainable upon any theory or basis in the law.  However, with respect to Finding 14, which provides: "G & P's Agreement to Provide Guaranty with FSC [i.e., the FSC Guaranty] expired on April 13, 2002. The Agreement to Provide Guaranty was not renewed," we note that the FSC Agreement, by its terms, expired on April 13, 2002, unless the G & P and FSC renewed the guaranty, in writing.  If such a writing exists, and, further, if, for privity purposes, the renewed agreement was material to the summary judgment proceeding, Appellants bore the burden to designate such agreement to the trial court to rebut the evidence that the FSC Guaranty expired on April 13, 2002.

7.  Indiana Code Section 23–1–32–1 provides:

A person may not commence a proceeding in the right of a domestic or foreign corporation unless the person was a shareholder

ed that we hold Berghoff personally liable to it, a corporate creditor of FSC, for purportedly breaching a fiduciary duty.

■■ In general, a creditor of a corporation may not maintain a personal action at law against the corporation's officers or directors who have, by their mismanagement or negligence, committed a wrong against the corporation to the consequent damage of the creditor, at least in the absence of an active intent to deceive or defraud creditors. *See* 18A Am.Jur.2d *Corporations* § 1597 (noting that a corporate outsider cannot bring suit to challenge a corporation's management or control); *see also* 18A Am.Jur.2d *Corporations* § 1587 (recognizing that "[o]fficers and directors are not implied guarantors of corporate debts, although they may expressly guarantee such debts."). There are exceptions to this general rule. If, for example, the director or officer has committed fraud or deceit, he or she will be treated as a fiduciary for the corporation's creditors. 18A Am.Jur.2d *Corporations* § 1597. In addition, in some jurisdictions, a director owes a fiduciary duty to creditors if the corporation is insolvent and no longer a going concern. *Id.* (citing *McGivern v. AMASA Lumber Co.,* 77 Wis.2d 241, 252 N.W.2d 371 (1977)).

■ However, Indiana does not adhere to the "trust fund" theory that insolvent manufacturing corporations, like FSC, hold their property in trust for their creditors. In *Nappanee Canning Co. v. Reid, Murdock & Co.,* 159 Ind. 614, 615, 64 N.E. 870, 872 (1902), the Indiana Supreme Court held:

> Until [a corporation's] property passes into the custody of the law by seizure

under proceedings in attachment, or by the appointment of an assignee, trustee, or receiver, the corporation may sell, transfer, pledge, or mortgage its property in the same manner and subject to the same restrictions only as apply to the case of a private person. Such property is in no respect held in trust for the creditors of the association. The law of this state gives them no lien or claim upon such property. *They have no right to look to the corporation or its directors to protect their interests.* They deal with it at arm's length, and their attitude is antagonistic to the association. When asked to extend credit to it, all persons dealing with the corporation know that if it is, or thereafter becomes, insolvent, the whole of its property may be applied to pay or secure debts due to favored creditors, including officers and directors, and that the claims of all other creditors may be excluded and consequently lost. If, with this knowledge, credit is given, it cannot be said that preferences subsequently conferred upon other creditors have violated any right which the law gave to the creditor whose claim was left unpaid and unsecured.

*Id.* (emphasis added); *see also Garvin v. Chadwick Realty Corp.,* 212 Ind. 499, 511, 9 N.E.2d 268, 273 (Ind.1937). The *Nappanee Canning* Court also observed that "[t]he duty of the directors [and officers] is to the corporation and its stockholders, not to the creditors." *Nappanee Canning Co.,* 159 Ind. at 616, 64 N.E. at 873. With this law as our guide, we now address Appellants' contention of error.

of the corporation when the transaction complained of occurred or unless the person became a shareholder through transfer by operation of law from one who was a shareholder at that time. The derivative

proceeding may not be maintained if it appears that the person commencing the proceeding does not fairly and adequately represent the interests of the shareholders in enforcing the right of the corporation.

Here, Appellants do not contend that Berghoff committed fraud or deceit and, therefore, the first exception is inapplicable to the case at bar. Instead, Appellants assert that "once FSC entered insolvency, Berghoff had fiduciary duties to G & P." Appellants' App. at 27. However, as previously mentioned, Indiana does not extend the fiduciary duties of directors and officers to the corporation's creditors. To the contrary, Indiana permits corporations, while prosecuting their corporate business even with liabilities greater than assets, to prefer certain creditors—including officers and directors—to others, as would an individual. *See, e.g., Nappanee Canning Co. v. Reid, Murdock & Co.,* 159 Ind. 614, 64 N.E. 1115 (Ind.1902) (Hadley, J., dissenting).[8] Because Berghoff did not owe G & P any fiduciary duties as a result of its creditor status, the trial court properly granted summary judgment to Appellees on Appellants' claim that the officer breached a fiduciary duty.

### B. Personal Cause of Action

Appellants next contend that material issues of fact exist as to whether G & P, as a guarantor of FSC, has standing to pursue a personal cause of action against Berghoff for breach of a fiduciary duty. In particular, Appellants maintain that "Indiana recognizes personal causes of action by corporate guarantors as to third parties" and, further, that these claims "stem from the recognition of claims by corporate shareholders individually." Appellants' Br. at 16. To support these contentions, Appellants rely upon *Sacks v. Am. Fletcher Nat'l Bank & Trust Co.,* 258 Ind. 189, 194–95, 279 N.E.2d 807, 811–12 (1972), and *Buschmann v. Prof'l Men's Assoc.,* 405 F.2d 659, 662 (7th Cir. 1969). In *Sacks,* our Supreme Court recognized an exception to the general rule that shareholders of a corporation may not maintain actions at law in their own names to redress an injury to the corporation, even if the value of their stock is impaired as a result of the injury. *Id.* There, the shareholder plaintiff had personally guaranteed a corporate loan and, therefore, the Court held that a "personal cause of action arises when there is a breach of duty owed specially to the shareholder [i.e., the guaranty] separate and distinct from the duty owed to the corporation." *Id.* at 811.

Similarly, in *Buschmann,* a case that arose in the Southern District of Indiana, the court held that a plaintiff shareholder could maintain a personal cause of action to recover damages for breach of contract against the defendant because the wrong was both to the shareholder as an individual guarantor and to the corporation. 405

8. We recognize that *Nappanee Canning* was decided in 1902. However, its analysis is still persuasive, at least under the present circumstances. Indeed, under the FSC Guaranty, G & P could potentially profit if FSC exceeded its borrowing base during one calendar quarter but repaid the excess during the next calendar quarter. In particular, pursuant to the FSC Guaranty, if FSC exceeded the borrowing base, it would be required to not only reimburse and indemnify G & P for all payments made by G & P on the Bank Guaranty, but also pay G & P 2% interest per annum on the greatest amount that FSC's Credit Note exceeded the Borrowing Base, i.e., $10,000,000.00, during such calendar quar-

ter. In light of the contractual arrangement between FSC and G & P, were we to extend Berghoff's fiduciary duty to G & P, Berghoff would likely be forced to choose between acting in the best interests of the corporation (i.e., making certain that the line of credit does not exceed the borrowing base) or the best interests of the creditor (i.e., ensuring that G & P receive interest under the FSC Guaranty). Such a choice would place Berghoff in an untenable position and would erode our longstanding principle that officers and directors must deal fairly, honestly, and openly with their corporations and fellow shareholders.

F.2d at 662. The *Buschmann* Court noted:

> Notwithstanding the fact that the corporation has a cause of action against the defendant for mismanagement, Buschmann has a personal cause of action against the defendant to recover damages for breach of the contract, even though the corporate cause of action and Buschmann's cause of action result from the same wrongful acts. The defendant made promises directly to Buschmann[,] the breach of which gave rise to a cause of action. Buschmann's cause of action is manifestly personal and not derivative since his liability to pay the corporation's indebtedness to the Bank, which is his principal item of damage, does not arise from his status as a stockholder of the corporation.

*Id.* at 663.

These cases are inapposite to the present case. In *Sacks* and *Buschmann*, the courts allowed a *shareholder guarantor* to maintain a personal cause of action against a third party whose actions had wronged both the corporation and the shareholder—the latter, by way of the guaranty. Here, by contrast, G & P—a corporate guarantor and non-shareholder of FSC—brought a personal cause of action against Berghoff—an officer of FSC, the corporate debtor—for his actions, which allegedly led to the demise of FSC.

Moreover, we have found no Indiana authority that allows G & P to sue the officer of a corporation under a breach of fiduciary duty theory. Rather, under *Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind.Ct.App.1998), *reh'g denied, trans. denied*, we conclude that Berghoff did not owe a fiduciary duty to G & P, as FSC's corporate guarantor. In *Paulson*, another panel of this Court observed:

> A fiduciary relationship does not exist between a lender and a borrower unless certain facts exist which establish a relationship of trust and confidence between the two. A confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. Not only must there be confidence by one party in the other, but the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. Furthermore, it must be shown that the dominant party wrongfully abused this confidence by improperly influencing the weaker so as to obtain an unconscionable advantage. Whether such a relationship exists is essentially a question of fact.

*Id.* (internal citations omitted). In the case at bar, Appellants have failed to designate any evidence that G & P was in a position of "weakness" or unequal bargaining power with FSC or Berghoff. Rather, the evidence demonstrates that G & P is a successful corporation in the steel fabricating business and that, at least in 2001, it was financially able to loan FSC $3,000,000.00 and to serve as a corporate guarantor. Because Appellants have failed to establish a relationship of trust and confidence between G & P, i.e., the lender, and FSC, i.e., the borrower, the trial court did not err by granting summary judgment to Appellees on this issue.

### C. Tortious Interference with a Business Relationship

Appellants next maintain that the trial court erred by granting Appellees' motion for summary judgment with respect to Peters's claim that Berghoff and Lenex committed tortious interference with a business relationship by soliciting FSC's most important customer, Duke Construction. The elements of tortious interference with a business relationship

are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 598 n. 21 (Ind.2001) (citing *Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind.Ct.App.2000)). Additionally, our Supreme Court has held that "this tort requires some independent illegal action." *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.,* 796 N.E.2d 286, 291 (Ind. 2003), *cert. denied,* 541 U.S. 902, 124 S.Ct. 1602, 158 L.Ed.2d 244 (2004); *see also Watson Rural Water Co., Inc. v. Ind. Cities Water Corp.,* 540 N.E.2d 131, 139 (Ind. Ct.App.1989) ("In the State of Indiana, an element necessary to prove this cause of action is that a defendant acted illegally in achieving his end."), *reh'g denied, trans. denied.*

■ According to Appellants, genuine issues of material fact exist regarding whether Berghoff and Lenex diverted Duke Construction's business from FSC to Lenex. However, even assuming that business was diverted from FSC to Lenex, the designated evidence failed to demonstrate any illegality on behalf of Berghoff and Lenex, and Peters does not argue that Berghoff's and Lenex's conduct was illegal. Instead, the crux of Peters's argument is that Berghoff depleted FSC's cash flow, attempted to obtain ownership of FSC at a discount, and diverted work from FSC to Lenex. Because no illegality is alleged, Appellees were entitled to summary judgment as a matter of law on Peters's tortious interference with a business relationship claim. *See, e.g., Levee,* 729 N.E.2d at 222–223 (holding that the trial court properly granted the defendants' summary judgment on the plaintiff's tortious interference with a business rela-

tionship claim where there was no illegal conduct).

For the foregoing reasons, we affirm the trial court's grant of summary judgment to Appellees.

Affirmed.

KIRSCH, C.J., and CRONE, J., concur.

### ORDER

The Appellees, by counsel, have filed a Motion to Publish August 22, 2006 Memorandum Decision. The Appellees request publication of this case because it establishes, modifies, or clarifies a rule of law pursuant to Appellate Rule 65(A)(1).

Having reviewed the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. The Appellees' Motion to Publish is GRANTED, and this Court's opinion heretofore handed down in this cause on August 22, 2006, marked Memorandum Decision, Not for Publication, is now ORDERED PUBLISHED.

All Panel Judges concur.